Argued January 29; reversed February 19; rehearing
denied April 23, 1946

ORSEN ET UX. *v.* SIEGLE ET AL.

(165 P. (2d) 990)

*Blaine Hallock,* of Baker (Hallock, Donald & Banta, of Baker, on the brief), for appellants.

*David E. Lofgren* and *James H. McMenamin,* both of Portland, for respondents.

BELT, C. J.

This is a suit to set aside an alleged fraudulent conveyance. The warranty deed in question purports

to have been executed by defendants Carl Siegle and his wife, Elsie, on November 6, 1934, and conveys to defendant C. J. Brown 480 acres of land in Malheur County, Oregon, known as the Jamieson ranch. This is the second appeal. On the first trial, in 1941, the suit was dismissed with prejudice at the conclusion of the plaintiff's case in chief. Plaintiffs appealed from the decree of dismissal and this court held that a prima facie case of fraud had been established. The decree was therefore reversed and the cause remanded, giving the defendants the opportunity to go forward with the evidence and show that Brown, in good faith, paid a valuable consideration for the conveyance. *Orsen et ux. v. Siegle et al.,* 170 Or. 154, 132 P. (2d) 409. After hearing on the second trial, the circuit court entered a decree setting aside the deed as a fraudulent conveyance. From this decree, the defendants have appealed.

In view of the statement of the facts in the opinion on former appeal, the statement herein will be brief. The precise question is whether the evidence now before us is sufficient to overcome the prima facie case of fraud.

Defendant appellants assert that the consideration for the deed in question was: (1) Brown's unsecured promissory note in the sum of $2,600. (2) Brown's agreement to pay Siegle's indebtedness to "Tony" Braun amounting to $1,500. (3) Brown's agreement to pay delinquent taxes amounting approximately to $2,000 on property, in Idaho, known as the Lick Creek ranch. Plaintiffs contend there was no consideration for the deed and that it was made to hinder and defraud them in recovering the amount due on a mortgage indebtedness.

For some years prior to 1930, the Siegles owned and operated the Castle Rose Apartments, in the city of Portland, which was erected and furnished at a cost of approximately $150,000. In 1925, the Siegles executed a first mortgage on this property in favor of the New York Life Insurance Company in the sum of $70,000. In 1927, they borrowed $10,000 from the plaintiff Orsens and gave as security a second mortgage on the apartment house and, as additional security, a first mortgage on certain lots in the city of Portland of an appraised value of $16,300. This appraisal was made by G. E. Gaylord, an experienced appraiser, in December, 1929, at the request of the United States Mortgage and Trust Company of New York City. The apartment house, during these hectic years of depression, was operated at a loss and the Siegles were rapidly losing money on their investment. The Siegles decided to exchange the apartment house property, subject to these mortgages, to the DeTweede Northwestern and Pacific Hypotheekbank of Spokane, Washington, in consideration of eleven ranch properties in Oregon, Washington and Idaho. When the Siegles acquired these dry ranch properties, they entered into an agreement, in 1932, with a real estate broker, J. C. Palmer, who was given the right to sell and dispose of the same and to retain all money in excess of $11,250 derived from such sales.

The operation of the apartment house by the bank did not prove successful, and payment on the mortgage notes became delinquent. On March 13, 1935, the New York Life Insurance Company filed suit against the Siegles in the Multnomah County Circuit Court to foreclose its mortgage on the Castle Rose Apartments, making the Orsens parties-defendant. A balance of

$49,000 was then owing on the principal of the mortgage indebtedness. On May 4, 1935, the Orsens filed their answer and cross complaint praying for a judgment against the Siegles and for the foreclosure of their second mortgage. On February 13, 1936, a decree was rendered which, among other things, gave judgment against the Siegles in favor of the Orsens in the sum of $10,668 and costs. On the foreclosure sale of the lots, the Orsens bid in the property for the sum of $2,000. Hence the deficiency judgment which they now seek to satisfy.

On former appeal it was assumed—based upon the admission of counsel for defendants—that Carl Siegle was the owner of the Lick Creek ranch. That there was good reason for this assumption is shown by defendants' brief wherein it is said: "Among the properties originally acquired by Siegle from the Hypotheekbank was what is known as the Lick Creek ranch in Idaho." It is now shown by evidence beyond question that Siegle never did have legal title to such property, but merely had a $10,000 mortgage on the same, which had been assigned to him by the bank in part consideration for the Castle Rose Apartment. The Lick Creek ranch was not included in such exchange, but only the mortgage thereon. The bank, by warranty deed, had conveyed the Lick Creek ranch to J. F. McDonald on November 2, 1928, which was six years prior to the execution of the alleged fraudulent conveyance in 1934. The court, having been led to assume that Siegle owned the Lick Creek property, reasonably concluded that the defendant Brown in dealing with such property was the "trustee and confidential agent of Siegle" and that the money derived by Brown in the various transactions concerning such property was in fact Siegle's money. In other words, that Brown

was just a dummy. If such confidential relationship had existed, there might well have been drawn from the evidence an inference that the conveyance of the Jamieson ranch was just a scheme of Siegle's to cover up his property and that Brown, in paying the indebtedness of "Tony" Braun, was in reality the agent of Siegle. If, on the other hand, no confidential relationship existed between Siegle and Brown, an entirely different inference might well be drawn from the transaction. Mr. Hallock, of counsel for defendants, now concedes that the admission made by him on former appeal, relative to the ownership of the Lick Creek ranch, was erroneous and made through inadvertence. It is not surprising that some confusion might arise from a consideration of the intricate facts in this case. With some degree of magnanimity, counsel also now concedes that the court's conclusion on former appeal that a prima facie case of fraud had been made was "perhaps justified by the incomplete matter then in the record."

We have said that Siegle never at any time had any legal title to the Lick Creek ranch. We also are convinced, in the light of the record now before us, that Siegle had no interest whatever in such property after April 24, 1933, when he assigned the $10,000 mortgage to his mother-in-law, Mrs. Sophia Braun, in satisfaction of his indebtedness to her. We believe that this assignment of the mortgage was a bona fide transaction. When Siegle owned and operated the Castle Rose Apartment, he obtained a loan of $4,000 from his mother-in-law for the purpose of supplying additional furniture for the apartment house. As evidence of this indebtedness, he executed, in 1925, his unsecured promissory note in the sum of $4,000, bearing interest at 6% annum, and due five years after date.

During the years of depression, Siegle was hard-pressed for money and was unable to make any payment of principal or interest on the note. In 1930, the note became due and a renewal note was executed for $5,200—of which sum $1,200 represented interest accrued over a period of five years. When the mortgage was assigned in payment of the note in 1933, the amount due on the note was $5,928. When this assignment was made, Sophia D. Braun wrote over her signature and across the face of the Siegle note: "Paid, April 24, 1933." On the back of the mortgage note of $10,000 was the following endorsement by Carl Siegle and Elsie Siegle: "April 24, 1933. Pay to Sophia D. Braun." The disparity in value between the Lick Creek mortgage and the note of Siegle was not so great as to arouse suspicion. The Lick Creek ranch was sold on May 16, 1935, to Albert Linkous for $8,000. It is proven beyond doubt that Mrs. Braun loaned $4,000 to her son-in-law in 1925. She maintained a bank account and had a substantial amount of property. We think it is true, however, that Siegle was financially embarrassed and that Mrs. Braun was glad to accept the assignment of the mortgage in lieu of her son-in-law's note. Apparently Siegle was willing to assign the mortgage to his mother-in-law as she was insisting on payment of the note and he had no money with which to pay. Her testimony about the transaction—which was not before the court on former appeal—is convincing and speaks of no collusion or fraud.

On June 20, 1933, Carl Siegle borrowed $1,000 from his cousin, Anton ("Tony") Braun, and the sum of $500 from him on May 10, 1934. As evidence of such indebtedness, Siegle executed two promissory notes. It will be remembered that as a part of the considera-

tion of the sale of the Jamieson ranch Brown agreed to assume the indebtedness of Siegle to his cousin, "Tony" Braun. On November 8, 1934, which was two days after such sale, "Tony" wrote to Brown as follows:

"Mr. Siegle advises me that through a purchase you made from him of some property he had in Oregon, you assumed and are willing to pay two notes in the amounts of $1000 and $500 respectively, which I hold, signed by him, for money loaned.

"In view of the fact that Mr. Siegle is unable to pay me now and as I am anxious to secure return of this loan, it will be entirely satisfactory that you assume these obligations and will make payments directly to me.

"I would appreciate your acknowledgment of this understanding by signing and returning to me copy of this letter.

Yours very truly,
(signed) Tony Braun."

The above letter was returned with the following acceptance noted thereon: "I hereby assume and agree to pay the notes as above outlined. (signed) C. J. Brown." The letter is important as fixing the date of the sale of the Jamieson ranch on November 6, 1934—which plaintiffs contend was on May 10, 1935. It also strongly tends to show the good faith of the transaction. That Brown actually paid to "Tony" Braun $1,500 is shown by checks introduced in evidence. "Tony" acknowledged payment in full of the two notes in a letter to Brown dated June 10, 1940.

The evidence discloses that "Tony" Braun, a bachelor 53 years of age, is a substantial citizen. He has been employed for over 20 years as Station Clerk by the Southern Pacific at Portland, Oregon. His deposition shows that he is a fair witness and had no

desire to evade telling all that he knew about the transaction. There could be no reasonable inference drawn from the evidence that "Tony" was in any way involved in a family scheme to cover up Siegle's property. "Tony"—unlike Carl Siegle—was a good business man and his aunt Sophia had the utmost confidence in him as will be shown by transaction hereinafter discussed.

On the first trial, the evidence, relative to payment by defendant Brown of delinquent taxes on the Lick Creek ranch, was very meager. The record now shows beyond question that Brown paid these taxes in keeping with the terms of the contract of purchase. Some of the tax receipts were taken in the name of other persons, but the payments were made for and on behalf of Brown. It may be considered strange that Siegle would require Brown to pay taxes on the Lick Creek property at a time when he had no interest in the same. His explanation that he did so to protect his mother-in-law's mortgage on the property is not unreasonable, since she had befriended him at a time when he was in need of assistance. We think it is established by the evidence that Brown has fully performed the contract on his part. Indeed, the court on former appeal held that there was adequate consideration to support the contract of purchase.

It is true that at the time of the conveyance in question—which was four months prior to the commencement of the mortgage foreclosure proceedings—Carl Siegle was in financial difficulties, but it is plain that he and the Orsens both thought there was ample security to satisfy the mortgage indebtedness and that no deficiency judgment against Siegle would result. They also believed that in any event the bank would assume

liability. That such was the belief of Mr. Lofgren, attorney for plaintiffs, is shown by his testimony as follows:

"Q At that time, Mr. Lofgren, you felt quite certain that the value of the Castle Rose Apartment and these lots adjoining it were amply sufficient to take care of the forty-nine thousand dollars on the New York Life's mortgage and the ten thousand dollars of your clients?

"A Yes, as I said, with cooperation on the part of the Siegles we could have worked it out.

"Q In other words you felt that the values were amply there in those properties?

"A Yes.

"Q In addition to that you were satisfied that in any event the Hypotheekbank was the one that had assumed and was liable for all of that—?

"A I had been so informed.

"Q And you felt it?

"A Yes.

"Q And the Hypotheekbank was a big, rich, going concern, wasn't it?

"A Yes.

"Q Entirely sound and well able to respond to that kind of obligation at that time?

"A Yes, I presume they were."

When the New York Life Insurance Company commenced suit to foreclose its mortgage, plaintiff Orsens herein filed an answer and cross complaint in which it is alleged: "* * * that under and by virtue of the said conveyance from Carl Siegle and Elsie Siegle to R. Insinger, the said R. Insinger, as agent and trustee for the defendant DeTweede Northwestern and Pacific Hypotheekbank, assumed and agreed to pay the note and mortgage made by the defendants, Carl Siegle and Elsie Siegle, to the defendants and cross complainants, A. L. Orsen and Fannie Orsen, husband and wife."

The answer of the Siegles also alleged in substance that the bank had assumed and agreed to pay such mortgage indebtedness when the Castle Rose Apartment was acquired by it.

We are not unmindful of the testimony of Mr. Lofgren, relative to the conversation which he said was held in his office in May, 1935, between him and the defendant Siegle, wherein mention was made about taking judgment against Siegle in the mortgage foreclosure proceedings. Be that as it may, we fail to see how such conversation would be relevant as to the intention of the parties to a transaction in 1934.

If our conclusion is sound, that Siegle had no interest whatever in the Lick Creek property after the assignment of the mortgage to his mother-in-law on April 24, 1933, then it follows that whatever dealings Brown had in connection with this property subsequent to such time would be immaterial so far as affecting the rights of Siegle, unless it is believed that all were engaged in a conspiracy. When an alleged fraudulent conveyance is involved, the evidence takes a wide range and we think it is proper to consider the various transactions for what they are worth in order to determine the intention of the parties at the time of the sale of the Jamieson ranch.

Soon after Mrs. Braun acquired the mortgage from her son-in-law, she threatened to institute foreclosure proceedings, as she was anxious to "get her money back." On account of her age and health, Mrs. Braun did not like to be bothered by business transactions. She therefore enlisted the aid of her nephew, "Tony" Braun, and turned the matter of foreclosure over to him. "Tony" contacted the defendant Brown and the latter agreed to handle the property if he was given

unlimited authority. Mrs. Braun was satisfied with this arrangement, provided that she would receive the sum of $5,000 when final disposition was made of the property. Defendants Sophia Braun, C. J. Brown and "Tony" Braun testified that such was the understanding and agreement. Negotiations were entered into with J. C. Palmer who, on June 16, 1933, had secured a quitclaim deed from Louise H. Wilkinson conveying the Lick Creek ranch to his son, Deo D. Palmer. On August 14, 1933, Deo Palmer conveyed this property to "Tony" Braun, who held title to the same for his aunt Sophia.

Plaintiffs, in keeping with their contention that Carl Siegle owned the Lick Creek ranch, assert that he was originally designated as grantee in this deed, but that subsequent to its execution Carl Siegle's name was erased and the name of "Tony" Braun was typed in the deed. We think there is no reasonable ground for this contention. An examination of the instrument discloses that the typewritten words "Braun, single" appearing thereon have never been erased or altered. It is probable that Mrs. Braun's initials, "S. D.", were erased and the name "Tony" was substituted therefor.

On May 16, 1935, defendant Brown, acting as agent for Mrs. Braun, sold this ranch to Albert Linkous for $8,000, $1,000 of the purchase price being paid on the execution of the deed and a $7,000 mortgage taken in the name of C. J. Brown to secure the balance of the purchase price. An additional payment of $1,000 was subsequently made to Brown. From the proceeds derived by Brown in dealing with the property, he remitted to Mrs. Braun the sum of $5,015.82, as shown by his checks to her. On December 28, 1939, Mrs. Braun wrote a letter to defendant Brown acknowledging re-

ceipt of a check for $500 and, in thanking him for his services in handling this property, she said: "You know, Mr. Brown, I always felt you were the right man to get me my money out of this property." Again on November 19, 1943, she wrote to him acknowledging receipt of his check for $3,600 which she says "pays the Lick Creek note in full" and which, together with other payments referred to in her letter, amounts to "a little over $5,000". She further states in this letter: "I told you some time ago I would be satisfied with $5,000, so I want to thank you for all your trouble in getting me my money."

If Brown was remiss in fully accounting for the money received by him in handling the Lick Creek property,—and we think the evidence discloses no ground for such claim—that would be a matter between Mrs. Braun and him—not Carl Siegle. We are unable to believe that Mrs. Braun and "Tony" Braun in all of these various transactions were conspiring with Carl Siegle to defraud the plaintiffs. Neither do we think that Carl Siegle was guilty of fraud.

The defendant Brown, at the time of the purchase of the Jamieson ranch, had considerable real property, but, like many other persons in those years of depression, was short on cash. Brown was a shrewd trader and it is not surprising that he desired to be relieved of personal liability on the $2,600 note given as a part of the purchase price. Hence the assignment, on May 10, 1935, of the Adix third mortgage of $3,500 to Siegle in payment of the note. Brown had acquired the Adix mortgage on April 15, 1935, in exchange for an 80 acre ranch which he owned in Idaho. The Adix mortgage was on what is known as the Hornet Creek ranch, in Idaho. Siegle made an investigation of the property

and decided that the third mortgage was more valuable than Brown's note. The first and second mortgages on the Hornet Creek ranch amounted approximately to $9,000. The property was sold in 1940 for $12,500. Mr. Davidson, a real estate agent, testified that in 1935, when the mortgage was assigned to Siegle, the property had a value of $16,000. Siegle later assigned this mortgage to Mr. Walter L. Tooze as security for payment of attorney's fees. Mr. Tooze failed to record the assignment and in the foreclosure proceedings never realized anything on the mortgage for the years of professional services rendered by him. Regardless of the true value of the Adix mortgage, Brown's note for $2,600 undoubtedly constituted a valuable consideration.

■ The solution of this intricate case depends largely on whether Carl Siegle owned the Lick Creek ranch. If he did, it is plain to see that a confidential relationship existed between him and Brown. If he did not own such property, then no such relationship existed and the parties were dealing at arms' length. It is fundamental that fraud is not presumed and that he who charges fraud must establish it by clear and convincing evidence. There must be something more than mere suspicion to establish fraud. When the case was first before us, the record was very meager concerning many of the transactions involved. In the light of the admission of ownership of the Lick Creek ranch, the family relationship existing between the Siegles and the Brauns, and the unusual character of the course of dealing between the parties, the court properly held that a prima facie case of fraud had been shown. However, we now have before us a far more complete record wherein a satisfactory explanation has been

made by defendants of the various transactions involved, and we are convinced that the sale of the Jamieson ranch was a bona fide transaction.

It follows that the decree of the circuit court, setting aside the conveyance in question, is reversed and the suit of the plaintiffs is dismissed. Defendants are entitled to costs and disbursements.