Motion to dismiss appeal denied April 14; argued at Pendleton
October 26; reversed December 22, 1942

ORSEN ET UX. *v.* SIEGLE ET AL.
(132 P. (2d) 409)

Before KELLY, Chief Justice, and LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*David E. Lofgren* and *James H. McMenamin*, both of Portland (Robert D. Lytle, of Vale, on the brief), for appellants.

*Blaine Hallock*, of Baker (Hallock, Donald & Banta, of Baker, on the brief), for respondents.

LUSK, J. This suit was filed by A. L. Orsen and Fannie Orsen, husband and wife, on March 21, 1936, against Carl Siegle and Elsie Siegle, husband and wife, and others, to have declared fraudulent and void as to creditors a conveyance of lands in Malheur county, Oregon, by Siegle and his wife to the defendant C. J. Brown. The trial was had September 10, 1941. At the conclusion of the plaintiff's case the court, on motion of the defendants, entered a decree of dismissal with prejudice from which this appeal is taken.

The deed of conveyance attacked is dated November 6, 1934. The Orsen judgment, in the amount of $10,668 and costs, was recovered in the Circuit Court for Multnomah county on February 14, 1936, in a suit to foreclose a mortgage executed by the Siegles on real property in Portland known as the Castle Rose Apartments. The sum of $1,982.75 was realized on execution April 2, 1936, and the balance remains unsatisfied.

The complaint alleged that the conveyance to Brown was actually made May 13, 1935, instead of November 6, 1934, the date of the deed, and was without consideration; and it is contended that it was taken by Brown with knowledge of pendency of the foreclosure suit which resulted in the recovery of a judgment against the Siegles. The defendants answered jointly denying the allegations of fraud and want of consideration. The answer contains no affirmative averments.

For a proper understanding of the case it is necessary to give an account of events which occurred several years before the transaction in dispute.

Sometime prior to 1930 the Siegles, as owners of the Castle Rose Apartments, executed two mortgages upon that property, one to the New York Life Insurance Company to secure a loan of $75,000, and a second

mortgage to A. L. and Fannie Orsen to secure a loan of $10,000. The Orsen loan was further secured by a first mortgage on other property in Portland (which the Siegles conveyed and with which we are not further concerned). The Siegles traded the Castle Rose Apartments, subject to these mortgages, to the DeTweed Northwestern Hypotheekbank of Spokane, Washington, for eleven ranch properties in Oregon, Washington and Idaho, including 480 acres of farm land in Malheur county, known as the Jamieson Ranch, the property here in controversy. Under an arrangement with one J. C. Palmer, by which Palmer undertook to sell these properties, they were all disposed of prior to the year 1934, except a ranch in Idaho known as the Lick Creek Ranch and three ranches in Oregon—one in Wallowa county, one in Baker county, and the Jamieson Ranch in Malheur county. For convenience in carrying out the contract with Palmer, deeds to the various properties, dated October 31, 1930, were executed and acknowledged by the Siegles with the names of the grantees left blank and deposited in escrow in a Portland bank.

The defendant Brown was engaged in the real estate, loan and insurance business in Boise, Idaho, and controlled a corporation known as the National Mortgage Company. He first met Siegle in Portland early in 1934, and at that time Siegle tried to induce him to purchase the Oregon ranch properties. Brown at that time was in poor health, and it was not until October of that year that he was prevailed upon to make the deal. In the meantime he and Siegle had met several times, evidently became well acquainted, and on two occasions Brown lived at the Siegle home while a visitor in Portland, paying for the accommodation.

Brown, the only defendant who testified, was called as an adverse witness by the plaintiff, and it was shown

by his testimony, as well as that of Walter L. Tooze, at that time the Siegles' attorney, that the deeds were actually delivered to Brown in October or November, 1934, over four months before the commencement of the foreclosure suit which eventuated in the Orsen judgment, although the deed to the Jamieson Ranch and deeds to the properties in Wallowa and Baker counties, which Brown purchased at the same time, were not recorded until May, 1935.

The consideration for the transfer of the three properties, as testified to by Brown and Tooze, was as follows: Brown gave Siegle his note for $2,600 payable in one year. He assumed and agreed to pay two notes of Siegle's payable to Tony Braun, a cousin of Mrs. Siegle, one for $1,000 and the other for $500, and he assumed and agreed to pay the delinquent taxes, amounting to approximately $2,000, on property in Idaho known as the Lick Creek Ranch owned by Siegle.

Instead of executing new deeds, the old deeds which had been held in escrow under the arrangement with Palmer were sent to Brown in Boise, who himself caused his name as grantee to be inserted in the deeds to the Wallowa and Baker County properties; but, discovering that the description in the deed to the Jamieson Ranch was defective, he returned it to Siegle, who, with his wife, executed and acknowledged a new deed to this property, under date of November 6, 1934, and forwarded it to Brown.

On March 13, 1935, the New York Life Insurance Company filed suit against the Siegles in the Multnomah county Circuit Court to foreclose its mortgage on the Castle Rose Apartments, making the Orsens parties-defendant. A balance of $49,000 was then owing on the principal of the mortgage indebtedness. On May 4, 1935, the Orsens filed their answer and cross-

complaint praying for a judgment against the Siegles and for the foreclosure of their second mortgage. Shortly before the answer was filed, according to the testimony of David Lofgren, attorney for the Orsens, Siegle and Brown called at Lofgren's office and were informed by him that the Orsens intended to ask for a judgment against the Siegles in the foreclosure suit, and Siegle said: "That is bad."

The deeds to the Jamieson Ranch and the Baker County property were filed for record on May 13, 1935; that to the Wallowa County property on the next day. Brown's reason, as given by him in his testimony, for withholding the deeds from record until that time was as follows:

"I was criticized by my attorney and doctor for monkeying with this land and obligating myself to pay $2,600.00 in cash in one year because of my heart condition. So my attorney just kept the deeds there." (Apparently referring to his attorney's office.)

The evidence as to payment of the consideration agreed upon is as follows: Brown testified that he paid to Braun the Siegle $1,500 indebtedness which he had assumed. He was not asked and did not state when he paid it, nor whether by check, in cash, or otherwise. January 14, 1935, he paid 1931 taxes in the amount of $499.32 on the Lick Creek Ranch in Idaho, and May 24, 1935, he paid the balance of the 1931 taxes on this property amounting to $564.32. The 1932 taxes were paid by a purchaser of the property, and the 1933 taxes, amounting to $564, and the 1934 taxes, amounting to $523.63, were paid in 1936 with the checks of one Grace Ballantyne, from whom Brown testified he borrowed the money.

The $2,600 note which Brown gave Siegle was dated November 6, 1934, and, as stated, was payable in one year. On May 10, 1935, Siegle cancelled and surrendered the note to Brown and received in exchange therefor an assignment of a third mortgage on land in Adams county, Idaho, executed and acknowledged before a notary public in Multnomah county, Oregon, by one Carrie L. Adix, under date of April 15, 1935, but not recorded, and reciting a consideration of $3,500. A like consideration was recited in the assignment from Brown to Siegle. The assignment to Brown is in evidence, but the note and mortgage are not, and there is no evidence, other than the recital in the assignment, of the consideration paid for it by Brown. On April 20, 1936, Siegle, by an instrument reciting a consideration of $2,000, assigned this mortgage to Walter L. Tooze as security for the payment of the latter's attorney's fees. Tooze testified that the mortgage, which he had previously had in his possession, was for the sum of $3,500.

The first and second mortgages on this land were for $9,000, according to Brown's testimony. There is no evidence as to the character or quantity of the land and none as to its value at the time of the transactions just described, though Brown testified that it had "recently"—that is, in 1941—sold, evidently on foreclosure, for $12,000. He was asked by his counsel: "As far as you were advised and with the knowledge that you then possessed was that $3,500 mortgage one having value?" and answered: "Yes." Tooze did not record his assignment and realized nothing from it. There is no definite evidence as to the total amount of the mortgage indebtedness at the time the property was sold.

As pertinent to the question of payment of the consideration, the dealings with respect to the Lick Creek Ranch in Idaho will here be recounted. According to Brown's testimony, based on information which he acquired while living at the Siegles' home in Portland —he testified: "I have seen them and sat in the family when this thing was worked out"—a mortgage for $10,000 on this property had been "turned over" to Sophie Braun (who is Mrs. Siegle's mother and Tony Braun's aunt) in order to secure Mrs. Braun in the repayment of money, the amount of which is not disclosed, loaned by her to the Siegles to help them defray the cost of the furniture and fixtures installed in the Castle Rose Apartments. It was to preserve this security that Brown agreed to pay the delinquent taxes on the Lick Creek Ranch. The witness Tooze testified that he understood that Tony Braun "was to be protected on this Lick Creek property". Title to this property at that time stood in the name of Tony Braun. On May 16, 1935, (which was about the time Brown recorded his deeds), Braun deeded the Lick Creek Ranch to B. F. and Albert Linkous, who paid $1,000 in cash, and on the same day executed a mortgage for $7,000 to secure the balance of the purchase price. Brown apparently procured the purchaser, and the mortgage was taken in his name "in order to facilitate handling the property", at the suggestion of Mrs. Braun and Tony Braun, although Brown testified that he had no personal interest in it whatever. There is in evidence a certified copy of the certificate of the recorder for Adams county, Idaho, that on April 8, 1936, Brown assigned this mortgage to one R. G. Johnston. Concerning this transaction Brown testified: "I borrowed a thousand dollars on this mortgage with the consent of Mrs. Braun, and I assigned the

mortgage to R. G. Johnston for security''. There is no evidence as to what he did with the money, whether he gave a note for the loan, or whether he ever repaid it. There is also in evidence a certified copy of the certificate of the recorder of Adams county, Idaho, that under date of December 30, 1936, Johnston assigned the Linkous mortgage in blank. Brown testified that this assignment was to Grace A. Ballantyne. The consideration therefor is not disclosed, other than that Grace Ballantyne transferred to Brown a tract of land. Brown testified that he collected in the neighborhood of $3,500 from the proceeds of the sale of the land, that he took the major part of his commission out of a second thousand dollar payment, and that out of the proceeds he remitted to Mrs. Braun $1,500. There were received in evidence a cancelled check evidencing payment by him to Mrs. Braun of $500 in December, 1939, and a letter to Brown acknowledging the check. There is no evidence as to what disposition Brown made of the balance of the money.

Although the Siegles gave general warranty deeds to the properties conveyed to Brown, the titles were, in fact, all subject to delinquent taxes. After the deal was consummated taxes on the Jamieson Ranch were paid by the defendant, L. E. Hammack, as follows: January 19, 1935, for the year 1930—$335.04; November 25, 1936, for the year 1931—$195.37; November 25, 1936, for the year 1932—$159.92. Brown testified that Hammack was in possession of the Jamieson Ranch at the time he bought it under a contract of sale with Siegle, and thereafter remained in possession under a general understanding that Hammack was to buy part of the property with work. Brown himself does not appear to have paid any taxes on this property until January 12, 1941, while this suit was pending, when

he paid the 1934 taxes in the sum of $492.97. Until January 19, 1935, the property was assessed, apparently, to the DeTweed Northwestern Hypotheekbank, and from and after November 25, 1936, to Carl Siegle. The record does not disclose that it was ever assessed to Brown.

Brown testified that he paid such taxes on the Baker County property as he felt its value justified, but did not give any amounts, and that he paid no taxes on the Wallowa County property, which was going back to the county because it did not have sufficient value to justify retaining it.

The Jamieson Ranch property comprises 480 acres, of which 420 acres were under irrigation during the period involved in this suit. The land received water, however, only in the early spring. J. C. Palmer gave it as his opinion that the irrigated portion was worth $50 an acre, and testified that when he was acting under his contract with Siegle he was made an offer of $20,000 for it, which was not accepted because of objections interposed by one Lloyd, his partner. The Baker and Wallowa County properties are concededly of small value. It would be difficult from the evidence to do more than approximate the value of the three properties in 1934 and 1935. But, bearing in mind that these were depression years—a fact reflected by the reduction of the assessed valuation of the Jamieson Ranch from $9,540 in 1930 to $5,550 in 1931; that the properties were subject to delinquent taxes in considerable amounts; and that Siegle had authorized Palmer to sell, not only the three ranches which he conveyed to Brown, but three others as well, for a sum which would net Siegle $11,500, we are not prepared to say that the consideration which Brown agreed to

pay—approximately $6,000—was so inadequate as to shock the conscience.

■ Where a conveyance is attacked on the ground that it was made "with the intent to hinder, delay, or defraud creditors  *  *  * of their lawful suits, damages, forfeitures, debts, or demands" (§ 70-407, O. C. L. A.), three things must concur to protect the title of the purchaser: (1) He must buy without notice of the bad intent on part of the vendor; (2) he must be a purchaser for a valuable consideration; (3) he must have paid the purchase money before he had notice of the fraud. *Willamete Grocery Co. v. Skiff*, 118 Or. 685, 691, 248 P. 143; *Ball v. Danton*, 64 Or. 184, 195, 129 P. 1032; *Garnier v. Wheeler*, 40 Or. 198, 200, 66 P. 812.

■■ And, while the burden of proof to establish fraud is on the party who has the affirmative of the issue, yet where there are "accompanying circumstances, tending to excite suspicion and distrust as to the *bona fides* of the deed" (*Callan v. Statham*, 64 U. S. 477, 16 L. Ed. 532), the burden of explaining the transaction will be shifted to the transferee (24 Am. Jur., Fraudulent Conveyances, 334, § 218). This duty of explanation becomes more onerous whenever a confidential relationship is shown to exist. Then "the parties are held to a fuller and stricter proof of the consideration and of the fairness of the transaction", Bump on Fraudulent Conveyances (2d Ed.) 57.

That Brown was the trustee and confidential agent of Siegle as well as of Mrs. Braun there can be no doubt; for he was permitted, while dealing with the Lick Creek Ranch, to take a $7,000 mortgage on that property in his own name. He says that this was done at the suggestion of Mrs. Braun and Tony Braun, but it is to be remembered that this property at all times belonged to Siegle; that the indebtedness to Mrs.

Brown, as far as can be ascertained, did not exceed $1,500, while the property was sold for $8,000; and that Brown, unless he had some undisclosed agreement with Siegle to the contrary, would have been bound to account to Siegle for any moneys derived from the sale of the land in excess of the indebtedness to Mrs. Braun and a reasonable commission for his services. It is, indeed, a fair and almost necessary inference that Siegle and Brown had an agreement with respect to the handling of this property and the disposition of moneys derived from its sale to which he did not testify, for it is contrary to the usual course of business for one man to give another *carte blanche* to deal with his valuable property.

The evidence satisfies us that the deeds to the Jamieson Ranch and the other Oregon properties were given in October or November, 1934, and not in May, 1935, as alleged in the complaint. We accept as true the testimony of Lofgren that late in April or early in May, 1935, Brown learned from Lofgren of the pendency of the litigation in which a judgment would be sought against the Siegles. He already knew of the Siegles' embarrassed financial condition; he had "sat in the family", as he testified. At the meeting in Lofgren's office he took an active part in the discussion, saying:

"Now the New York Life, you don't want to think for a minute that we expect to pay them the whole amount of that judgment. We will ask them for a statement. All the mortgage companies are taking a discount."

■■ If any consideration whatever was paid by Brown, far the greater part was paid after he had acquired knowledge of this litigation. The transfer operated to strip the Siegles of all their property except the

Lick Creek Ranch, the title to which at that time stood in the name, not of Siegle, but of his wife's cousin, Tony Braun, and to render them immune to execution.

This is a badge of fraud, and, in connection with the fact of the relationship of trust and confidence existing between the parties, serves to impose upon the grantee the duty of making a full, candid and complete explanation of the transaction and especially of showing that the agreement for the payment of the consideration was not a sham but was entered into in good faith and actually performed. *Orr v. Bauer*, 156 Or. 409, 417, 67 P. (2d) 770, and cases there cited; *Clarke v. Philomath College*, 99 Or. 366, 378, 193 P. 470, 195 P. 822; 27 C. J., Fraudulent Conveyances, 493, § 146; Bump on Fraudulent Conveyances (2d Ed.) p. 53. Speaking of the character of the proof of payment upon which the law insists, it is said in the text last cited:

"The facility with which a fictitious payment may be fabricated renders it necessary for him (the grantee) to produce all the proof which may reasonably be supposed to be in his power of the reality and fairness of the transaction, and the want of clear proof is evidence of fraud. Such proof is vital to uphold a transfer in other respects surrounded with suspicion, and this requirement is not met by the mere production of notes and receipts, *or the mere proof of payment without any attempt to show where the money came from, how it was obtained or whose it was,* or what was done with it. Want of preciseness as to dates, time and amount excites suspicion, for the facts occurring in a suspicious transaction would naturally make an impression which would not be effaced from the memory very soon, and the testimony, if the transfer is recent, should be clear, accurate and specific." (Italics supplied.)

For an application of this doctrine see *Connel v. O'Connor*, 159 Or. 348, 354, 359, 80 P. (2d) 542. The italicized language in the quotation we have taken from Bump on Fraudulent Conveyances has, as will be seen, peculiar significance in connection with the facts here under examination.

■ Brown being the only defendant to testify, we are compelled to look solely to his account of the transaction and such information as Mr. Tooze, Siegle's attorney, was able to furnish, in order to determine whether the evidence adduced can be said to be sufficient to sustain that burden. In our opinion, for reasons now to be stated, it is insufficient.

Shortly after receiving notice that a judgment was likely to be recovered against the Siegles in the foreclosure suit and a few days before Brown recorded the deeds, Siegle cancelled and surrendered to Brown the latter's $2,600 note in exchange for a third mortgage which in the end yielded its holder, Walter L. Tooze, not a penny. Siegle got nothing out of it, for he assigned it to Tooze, not in payment of the attorney's fees owing to him by Siegle, but merely as security. The only evidence that this mortgage had any value at the time of that transaction is Brown's statement that it "had value", which may mean $2,600 or $26. The best evidence that it had no value in 1941 is that it was wiped out in the foreclosure suit. The only evidence that Brown paid anything for it is the recited consideration of $3,500, but it would be idle to contend that this was the true consideration, for Brown acquired the mortgage on April 15, 1935, and within less than a month transferred it in liquidation of a supposed $2,600 indebtedness. If Brown's note was given for a *bona fide,* and not a bogus, debt, we should have expected,

bearing in mind the usual precautions which men take in their important business affairs, that Siegle, before accepting the mortgage and cancelling the note, would have investigated its value, but, so far as appears, he did not do so. The evidence all points to the conclusion that Siegle accepted a worthless mortgage for what purported to be a valid $2,600 obligation. If the transaction was honest and not intended to deceive creditors, he may be able to explain his conduct, but, as he did not testify and Brown's evidence is meagre and not convincing, the best that can be said for the defendants is that they have failed to prove satisfactorily the genuineness of the debt evidenced by the note.

We go now to the Lick Creek Ranch transaction. It will be recalled that Brown agreed, according to his testimony, to pay delinquent taxes on this property amounting to approximately $2,000 in order to preserve Mrs. Braun's security for the Siegles' indebtedness to her; that he paid $499.32 of the 1931 taxes in January, 1935, and $564.32 in May, 1935; and that he claims to have paid no other taxes thereon except those for 1933 and 1934, in an amount exceeding $1,000, which, however, was actually paid on December 18, 1936, by Grace Ballantyne, from whom Brown testified he borrowed the money. By pledging the security of the Linkous mortgage, which was made in his name instead of the name of Mrs. Braun, the supposed mortgagee, Brown got out of this property for himself the sum of $1,000. He received from the proceeds of the sale of the property a total of approximately $3,500, and of this amount remitted to Mrs. Braun $1,500, which, in the absence of any evidence to the contrary, we may assume was the extent of the indebtedness of the Siegles to Mrs. Braun. This left $2,000 in Brown's hands with no showing as to what disposition he made

of it. The amount of his commission and of the expense connected with the sale is not shown, but, obviously, it could not have been $2,000 or anything like that sum. Thus, he has failed to account for more than enough money coming into his hands to have paid the indebtedness to Tony Braun. The amount which he testified he borrowed on the mortgage was nearly sufficient to reimburse him for the taxes which he paid with his own funds, and there is no evidence of the terms of the supposed loan or that he has ever repaid it. Furthermore, unless Brown was taking things into his own hands, it is difficult to conceive of this transaction taking place without the consent and approval of Siegle, for, after all, it was Siegle's property that Brown was dealing with. He testified that the assignment in blank of the $7,000 mortgage was made to Grace Ballantyne. She is the same person who advanced moneys to him for the payment of taxes on the Lick Creek Ranch. These taxes were paid by her on December 18, 1936, and the assignment to her is dated December 30, 1936. This may be mere coincidence, but, in the absence of any evidence as to the consideration paid by Grace Ballantyne other than Brown's vague statement that it was a "tract of land", it would not be unreasonable to infer a connection between this assignment and the tax money which she had advanced. The facts, as testified to by Brown, when they are all pieced together, lead to one of two conclusions—either that he wrongfully converted a part of the proceeds of the sale of the Lick Creek Ranch, or that it was such proceeds,—in other words, Siegle's money—which provided the fund with which to pay the consideration agreed upon by Brown and Siegle. We are not prepared to place the former construction upon Brown's conduct.

■ We are unable to agree with the contention of the defendants that the evidence as to Brown's handling of the Lick Creek Ranch and its proceeds is too remote to be admissible. On the contrary, we think it fairly manifest that the agreement between Siegle and Brown, whatever it might have been, pursuant to which Brown became the virtual overlord of this land, was part and parcel of the deal between Brown and Siegle for the conveyance to the former of Siegle's Oregon properties, and that the true inwardness of the challenged transaction cannot be discovered without a full disclosure and careful analysis of all Brown's activities in his capacity of Siegle's trustee and confidential agent. The evidence is, therefore, relevant and material.

As previously stated, Brown furnished no details or supporting data with respect to the alleged payment of $1,500 to Tony Braun. Had this been the only question of consideration involved, this paucity of proof might not have controlling significance, in view of the fact that Brown was not further examined on the subject by counsel for the plaintiff. In view, however, of Brown's dubious dealing with the Lick Creek Ranch, his failure to testify when, by what medium, and with what funds he paid Braun, is a circumstance which cannot be ignored in attempting to appraise his conduct and to determine whether a real consideration was agreed upon and paid for the challenged deed.

■ In short, we think that Brown's testimony, instead of removing, serves but to increase the suspicion which hangs over the transaction, and leaves the case in such a posture that on the present record, without more, the court would have no other alternative than to decide that the deed to the Jamieson Ranch was given with the intent to hinder, delay or defraud creditors.

Inasmuch, however, as the court below ordered the dismissal of the suit without requiring other proof on the part of the defendants than that given by Brown as a plaintiffs' witness, we think that the ends of justice will be served if the defendants are afforded an opportunity to present all the evidence available to them, and that the case should, therefore, be remanded for further proceedings. Such a course conforms to many precedents in the decisions of this court. See, *In re Braun's Estate*, 161 Or. 503, 513, 90 P. (2d) 484, and cases there cited, especially *Robson v. Hamilton*, 41 Or. 239, 246, 60 P. 651.

■ The plaintiff, A. L. Orsen, died in 1939, and Fannie Orsen was permitted by the court to prosecute the suit as sole plaintiff. It was contended by the defendants on the trial, and it is contended here, that since the one year limitation (§ 1-311, O. C. L. A.) for continuing the suit by the personal representative of A. L. Orsen expired before the trial, and no substitution of the personal representative was had, the right of action, in so far as A. L. Orsen is concerned, abated, and that the court lost jurisdiction of the cause. We think that this question is concluded by our decision in *Huber v. Portland Gas & Coke Co.*, 128 Or. 363, 274 P. 509. That was an action for damages for trespass alleged to have been committed upon real property purchased under contract by Joseph Huber and Minnie Huber, the plaintiffs. Joseph Huber died before verdict, and there was no substitution of any personal representative. The court held that the cause of action, being joint, survived to the other plaintiff. The following was quoted from 1 R. C. L., § 33, Abatement and Revival:

"In case of a joint right, it is for the whole as to each party, and not for any particular part

which one party may recover separately. Hence, in the absence of any statutory provision on the subject, a joint cause of action, on the death of one of those in whose favor it exists, survived to the survivor or survivors, whether it is founded in tort or in contract."

See, to the same effect, 1 Am. Jur., Abatement and Revival, 86, § 116.

Numerous cases support the doctrine, among which may be cited: *Rowe v. Shenandoah Pulp Co.*, 42 W. Va. 551, 26 S. E. 320, 57 Am. St. Rep. 870; *Stoer v. Ocklawaha River Farms Co.*, 223 Ala. 690, 138 So. 270; *Haven v. Brown*, 7 Me. 421, 22 Am. Dec. 208; *Denigan v. San Francisco Savings Union*, 127 Cal. 142, 59 P. 390, 78 Am. St. Rep. 35; *Semper v. Coates*, 93 Minn. 76, 100 N. W. 662; and *Supreme Lodge v. Portingall*, 167 Ill. 291, 47 N. E. 203, 59 Am. St. Rep. 296. See, also, 2 Williston on Contracts (Rev. Ed.) 1016, § 344.

Even though it should be held as a matter of substantive law that A. L. Orsen and Fannie Orsen were owners in severalty of the judgment, still, that doctrine of substantive law would not affect the application of the procedural rule approved in *Huber v. Portland Gas & Coke Co.*, supra, for, as the authorities show, though the estate, as between the plaintiffs, is several, the right of action is joint; and, as pointed out in *Denigan v. San Francisco Savings Union*, supra, in speaking of an action on a bond held by two joint obligees or on the promise of payment of money to two joint promisees, "the survivor will hold the security and proceeds as trustee to the extent of the interest of the deceased joint obligee or promisee in the debt or fund". Hence, the surviving plaintiff, Fannie Orsen, may maintain this suit, not only on her own behalf, but also on behalf

of the interest of her deceased husband, and, if she should eventually prevail, the relief granted would extend to the protection of the interests of both.

For the reasons hereinabove given the decree of the circuit court will be reversed and the cause remanded for further proceedings not inconsistent with this opinion. None of the parties will recover costs or disbursements on this appeal.

The late Mr. Justice RAND did not participate in this decision.