Proceeding in the matter of the last will of Merica Newman, deceased. Richard Newman filed a will contest, opposed by Herbert Stover. *Page 643 
An order of dismissal was entered by the Circuit Court, Lake County, Charles H. Combs, J., and the contestant appealed.
The Supreme Court, Belt, J., reversed the order of dismissal and remanded the cause with directions, on ground that evidence as presented by contestant was sufficient to sustain his charge that will was executed as result of undue influence.
This is a suit challenging the validity of an instrument purporting to be the last will and testament of Merica Newman, deceased, on the ground of mental incompetency and undue influence. The proceeding, instituted first in the County Court, was, by virtue of § 13-502, O.C.L.A., transferred to the Circuit Court for Lake County to be tried and determined. At the conclusion of the contestant's evidence, the trial court, on motion of the proponent of the will, dismissed the suit with prejudice. From this order of dismissal the contestant appeals.
The motion for an "involuntary nonsuit and for an order dismissing the petition" was on the ground that there as a "total lack of proof showing any undue influence." At the time this motion was made, defendant did not rest his case or indicate any intention to introduce additional evidence to contradict or explain the charge of the contestant that the will was the result of undue influence. The effect of such motion was to submit the cause on an incomplete record to the court for decision on its merits. A nonsuit, while serving a good purpose in law actions, has no place in equity practice. In law the jury is the exclusive judge of the facts. In equity the chancellor is the judge of both the *Page 644 
law and the facts. On appeal from a judgment in a law action, this court does not weigh the evidence but determines whether there is any substantial evidence to support the judgment. On appeal from a decree in equity, the cause is tried de novo. Had the court denied the motion to dismiss, it is quite probable that the defendant would have offered evidence to refute the charge of undue influence. The defendant should not thus be permitted to try his case piecemeal. It is apparent that counsel for defendant intended to have the motion function as a demurrer to the evidence, but, nevertheless, the legal effect thereof was to submit the cause on plaintiff's evidence for decision on its merits. The trial court should have required defendant formally to close his case before considering the motion to dismiss.Rhode Island Hospital Trust Co. v. Gilleney, 61 R.I. 23,199 A. 691; Sundlun v. Volpe, 62 R.I. 55, 2 A.2d 875, 9 A.2d 41. As stated in 30 C.J.S., Equity, 972, § 579:
 "Dismissing a bill at the close of plaintiff's case, before defendant presents or rests his case, is not correct practice in equity, in the absence of express provisions to the contrary. The case being set down for hearing on the bill, answer and proof, if defendant is willing to risk his case on plaintiff's proof or rather the failure of plaintiff to prove his case, he should submit the case to the court for final hearing, and if he is not so satisfied, he should present what proof he desires or may be able to present."
Section 9-208, O.C.L.A., relative to a decree of dismissal provides:
 "Whenever upon the trial it is determined that the plaintiff is not entitled to the relief claimed or any part thereof, a decree shall be given dismissing the suit, and such decree shall have the effect to bar *Page 645 
another suit for the same cause or any part thereof, unless such determination be on account of a failure of proof on the part of the plaintiff, in which case the court may, on motion of such plaintiff, give such decree without prejudice to another suit by the plaintiff for the same cause or any part thereof."
The above section of the statute contemplates a full hearing on the merits before dismissing a suit in equity with prejudice.Roles v. Roles Shingle Co., 147 Or. 365, 31 P.2d 180. Ordinarily, it is bad practice in equity for a defendant to move for a dismissal at the conclusion of the plaintiff's case. RePeter's Estate, 73 Colo. 271, 215 P. 128, 33 A.L.R. 24; Johnsonv. Johnson, 313 Ill. App. 193, 39 N.E.2d 389; Laursen v.Memering Co., 260 Ill. App. 515; Koebel v. Doyle, 256 Ill. 610, 100 N.E. 154; Shepard v. Shepard, 353 Mo. 1057,186 S.W.2d 472; Stevens v. Trafton, 36 Mont. 520, 93 P. 810; Sundlunv. Volpe, supra; Kiss v. Gale, 187 Va. 667, 47 S.E.2d 353. In the light of the above authorities, the record is here for us to determine whether the Circuit Court at the conclusion of the contestant's case was warranted in finding that the evidence failed to show that the will in question was executed by reason of undue influence.
Having stated the question for decision, we will now consider the facts out of which this bitter and unfortunate controversy arose. On September 30, 1947, Merica Newman executed her will while she was living with her son, Richard Newman, on his ranch about fifteen miles distant from Lakeview, Oregon. This will, which was signed in the presence of her attorney, Forrest E. Cooper, and his wife, Gladys, devised and bequeathed all of testatrix' property to her eight children, viz., Harry, Sam, John, Diamond, Ralph, Con *Page 646 
and Richard, her sons, and Grace Smith, her daughter, share and share alike. The will provided that a "gift" of $1,200.00 to Grace was to be deducted from her interest in the estate; a "gift" of $419.00 to Diamond was likewise to be deducted from his interest; and the sum of $800.00 "advanced" to Sam was also to be deducted. Mr. Cooper, the attorney who prepared the will, testified that the decedent mentioned the trouble she was having collecting money from the above mentioned children and was particularly insistent that Diamond's share of her estate should be charged for the money loaned to him. The husband, John Newman, Sr., was not mentioned in the will. He and his wife had been estranged for many years but became reconciled shortly before her death. Richard, the contestant herein, was nominated as executor to serve without bond. At the time this will was executed, testatrix was a semi-invalid and 68 years of age. Mr. Cooper also testified without objection that when he consulted the decedent preparatory to drawing the will, she said that she was leaving everything to her son, Richard, and that she did not want three of her children to share in her estate, namely, Grace, Diamond and Sam. Mr. Cooper further testified that Richard convinced his mother that she ought to leave her estate to all members of the family and told her that if she did make such a will leaving all the property to him, he would divide it among the children and that "she might as well do it herself and get the credit for it." The validity of the will above mentioned is not at issue in this suit, but we have adverted to it for the purpose of showing the material difference between it and the will executed on October 15, 1947, the validity of which is challenged.
It is clear from the evidence that Richard was the *Page 647 
favorite son. Throughout the years of decedent's illness, Richard paid the bills and looked after his mother. When she was suspected of having tuberculosis, Richard took her to Arizona for treatment and paid most of the expenses thereby incurred. Richard also paid the expense of his mother's trip to Tennessee where she was hospitalized.
Decedent's father died in Kentucky in November, 1929, and her brother fraudulently induced her to release her interest in the father's estate. Suit was filed in Kentucky to set aside such release, and Richard twice took his mother to that state for the purpose of prosecuting the case. This litigation extended over a period of fifteen years and was twice brought before the Supreme Court of Kentucky for decision before finally terminating in decedent's favor. Newman v. Hall, 278 Ky. 88,128 S.W.2d 201, decided in May, 1939, and Newman v. Hall, 297 Ky. 537,180 S.W.2d 390, decided in May, 1944. Richard advanced the money to carry on this litigation and was acting under a general power of attorney authorizing him to transact the business for his mother. It is evident that decedent had the utmost confidence in Richard and that this feeling existed to the very end of her life. The feeling, however, between Richard and the rest of the children, with the exception of his two brothers, Con and Harry, was very bitter. Trouble arose over the disposition of property which decedent acquired from her father's estate and over which Richard exercised control. It was claimed by some of the children that Richard converted to his own use large sums of money belonging to his mother.
On October 6, 1947, Richard, upon the advice of a doctor, took his mother from his ranch to a "Rest *Page 648 
Home" at Lakeview in order to secure better medical treatment for her. While the mother was at this "Rest Home," Diamond and Grace were almost constantly with her. As one witness expressed it, there were always some of the children "on guard." At this time decedent was greatly weakened in mind and body. She had a severe heart attack two or three days before the will in question was executed. In this will decedent devised and bequeathed all her property to her children, share and share alike, with the exception of Richard, who was disinherited. Decedent thus expressed in her will the reason for disinheriting him: "I have heretofore given him money and property which is at least equal to his share in my estate." The fifth paragraph of the will provided: "To my husband, John Newman, I give nothing." Herbert Stover was nominated as executor and was referred to by the testatrix in her will as "my friend," although she had never met him. Stover, however, lived one mile from Richard's ranch, and it is entirely reasonable that decedent may have heard about him. It is argued by contestant that it was Diamond who was anxious to have Stover chosen as executor in order to protect him against claims of the estate. Richard filed an action against Diamond to recover $5,600.00 alleged to have been loaned to him. In the answer filed by Diamond in the law action, he alleged that the money was procured from his mother. On October 10, 1947, or five days before the execution of the last will wherein Stover was named as executor, Diamond executed a chattel mortgage on his potato crop in favor of Stover for the sum of $6,500.00. As a matter of fact, Stover personally had not loaned any money to Diamond. Stover claims to have been acting as agent for a buyer in San Francisco. His compensation *Page 649 
was based on a commission of five cents per sack. What was the purpose of the mortgage? Stover, as to the purpose of the mortgage, thus testified:
 "He [Diamond] was threatened by a lawsuit, and that they were threatening to take his potatoes away from him, and I wanted to protect my potatoes. He said he was threatened by his brother, Richard, and he was going to attach the potatoes, and had been informed so by the banker here in town, and he thought he should protect my interest, and a bill of sale wouldn't interrupt an attachment, and I wanted something on record to protect my purchase."
Contestant contends that Stover was acting in collusion with Diamond to prevent him from realizing on his claim. Stover testified that, aside from whatever might be realized from Richard in the accounting suit, the only assets of the estate were "about $646 cash and a trailer house that has not been appraised."
The will in question eliminated any charge for "gifts" or "advancements" made to Grace, Diamond and Sam in contrast to the prior will. The will was prepared by Robert L. Welch, of counsel for defendant, who, together with his then secretary, Miss Bettie Holman, acted as attesting witness thereto. Diamond and Grace were also present at such time.
On the same day that the will was executed, the decedent commenced a suit against Richard for an accounting of funds aggregating $70,000.00 alleged to have been acquired by him as a result of litigation in Kentucky. In the same complaint decedent also sought to recover from Richard the sum of $10,000.00 alleged to have been loaned to him by her. Decedent also at this same time revoked the general power of attorney above mentioned. *Page 650 
On November 3, 1947, while decedent — a very sick woman — was still in the "Rest Home" confined to her bed, her deposition was taken in the suit for accounting. There is evidence that after the deposition was taken, the decedent wanted to go back to Richard's ranch, but that Diamond strenuously objected and insisted that she go to Hilt, California, where Grace lived. Diamond, in the presence of his mother, threatened Richard with physical violence over this issue. The decedent was greatly disturbed over the bitterness existing among some of her children. There is evidence that in order to secure peace, the decedent and her husband decided to go to the home of Grace in California, where the mother died November 22, 1947. In the closing hours of her life she often called for her son, Richard.
In the deposition of decedent she told about Richard furnishing the money to carry on the litigation in Kentucky. She said he worked in the mines and put in "every dollar except enough to keep his family from starving to death." Decedent at such time had no money. According to her vague and indefinite testimony, she and Richard were to divide equally the money obtained from such litigation.
 "Q. Was that satisfactory to you to divide penny for penny?
 "A. Yes, that would have been satisfactory, but he didn't do it.
"Q. What did he do?
 "A. He dribbled it here to yonder, yonder to here, that's the way he done. He gave me $10,000.00, he went and put $10,000.00 in the bank.
"* * *
"Q. Whose name did he put the money in?
"A. My own name.
"* * * *Page 651 
"Q. Did you draw it out?
 "A. Well, I guess so, I guess I drawed it out you might say.
* * *
 "Q. If the case was won. Let me understand you clearly, if the case was won the children were to get $2 for every dollar invested?
"A. Yes.
 "Q. Did that apply to Richard as well as the other children?
 "A. Yes, that was all understood, we told them that every one put in $1 would get $2 when it was paid back, but about all that got was Johnny and Sam and Harry. Harry claims he put in a hundred or two dollars and Sam sixty or seventy, and that all stopped, stopped still.
 "Q. Now, Mrs. Newman, do you recall making a deed to your son, Richard, I think it was along about the time the law suit was finally won, of a one half interest in some land back in Kentucky?
"A. Yes.
 "Q. Will you tell how you happened to make the deed and the purpose of it, and so forth?
"* * *
 "A. I signed it because I thought he earned it, I thought it, I thought he earned it, that's what I thought. He told me all the hard times he had and all that stuff.
"* * *
 "Q. Just one more question, then we'll let you rest again. Do you recall down through the years since this law suit was won the times you would write Richard for money. Do you ever recall writing him for money?
"A. Yes.
"Q. Would he comply?
 "A. He always sent it to me. I never wrote to him for a dollar but I got a dollar. *Page 652 
 "Q. Would he send what you ask for, or cut you down?
 "A. Most of the time he'd send what I asked for if he possibly could and if he couldn't he'd send what he could. He was up against everything back there, hard work, hard work in the mines.
 "Q. You are talking about before the law suit was won?
"A. Yes.
 "Q. How about since the law suit was won, would you get what you asked for?
"A. He never denied a dollar to me.
"Q. He would send what you asked for.
 "A. He'd send what I asked for, and today if I'd ask for a thousand dollars today he'd get it.
"* * *
 "Q. How did you come to file this law suit at this time?
 "A. Just filed it to have some fun, I thought there would be some fun in it, I never was in a law suit myself and I thought Well, I'll start one myself, maybe I'll get some fun out of it, and me a laying here sick, could you imagine such a thing?"
(Italics ours.)
We are not unmindful that this is a will contest and not a suit for an accounting. We think the above testimony, however, is relevant to the issue of undue influence. In other words, did decedent disinherit her son on account of some breach of trust? What caused decedent to change her mind? It is recalled that the wills were only two weeks apart. On September 30, 1947, decedent expressed a desire to leave all her property to Richard, whereas two weeks later she disinherited him. Decedent undoubtedly on September 30, 1947, knew as much about her business relations with Richard as she did when the last will was executed. *Page 653 
Was her change in mental attitude toward Richard an expression of her own free will, or was it due to the dominance of those who sought to benefit thereby? This is the vital question, and it is one we must decide on an unsatisfactory and incomplete record.
In 57 Am. Jur., Wills, 313, § 442, it is said:
 "The weight of a former will which is inconsistent in its provisions with the will in dispute, as evidence in support of a charge of undue influence, depends upon the circumstances of the particular case, including the extent of the change made by the testator in the disposition of his property as reflected by the two wills and the suddenness of the change." (Italics ours.)
That a prior will, inconsistent with the will contested, is admissible, see note: 82 A.L.R. 970.
In Re Young's Estate, 33 Utah 392, 94 P. 731, the court in speaking of the change of will as tending to support the charge of undue influence said:
 "But the triers of the facts should be placed in possession of all of the facts and circumstances, as they may have affected the testator, and from them all determine the ultimate fact sought to be reached in such a contest. In this regard much may depend upon the length of time that elapsed between the prior and later will. The changes in the conditions as they may have affected the beneficiaries of the deceased's bounty; their conduct and demeanor towards him; the services or kindnesses they may have rendered or shown him in the later years of his life; and, in short, all the circumstances that may affect a person of feeble health or mind should be considered."
The testimony of Mr. Cooper that decedent at first desired to leave all of her property to Richard is corroborated *Page 654 
by that of Miss Bettie Holman, who testified by deposition that decedent "did not want the will that Mr. Cooper had made since that will gave all of her property and money to Richard and she wanted to revoke and cancel the will made by Mr. Cooper and make this instrument her last will and testament." It is observed that the decedent in her prior will did not leave all her property to Richard. If decedent made such a statement as attributed to her by Miss Holman — and we have no reason to doubt it — it indicates that decedent had slight conception of what she had done.
Mr. Robert L. Welch, who was also a witness for the proponent, testified, in anticipation of the contestant's charge of undue influence, that the decedent told him that she did not want Richard to have anything for the reason that "he had already gotten some $75,000 to $100,000 out of some litigation in Kentucky and that being the subject of this lawsuit, and she didn't want him to have anything more. She thought he had gotten more than his share at that time." Further, Welch testified that decedent said:
 "* * * Richard had gotten other money; at least, he hadn't turned it over to her, and she felt that he had received his share of her estate; and further then, that she didn't want him to have any further control of her property. She had executed the revocation of power of attorney, and she wanted to put a stop to him handling her affairs during her lifetime and after her death."
Con Newman testified without objection that his mother told him that "Ralph was going to shoot Ode [Richard] on sight." Such evidence has probative value as to the state of mind of the decedent. *Page 655 
Mr. Harry Newman testified without objection that a few days after the last will was executed, he and Richard called on their mother at the "Rest Home" and that Richard said:
 "`Maw, I hear me and you have a big lawsuit.' She said, `Yes, I guess we have.' She said, `They wouldn't let me rest 'til I signed those papers.'"
Witness said that his sister, Grace, was present when the above statement was made but said nothing in reply. John Newman, Sr., and Richard also testified as to this declaration of decedent. It is argued by respondent that this statement of decedent's about the "papers" had no reference to the will; but we think, as did the trial judge, that it may reasonably be inferred from the evidence that she was talking about all three of the transactions, viz., the complaint in suit for an accounting, the revocation of power of attorney, and the will.
This declaration of the decedent in the presence of those charged with having exercised undue influence called for an explanation or denial by them and, if not so made, warrants an inference of acquiescence in such statement. Swain v. OregonMotor Stages, 160 Or. 1, 82 P.2d 1084, 118 A.L.R. 1225. This evidence was admitted without objection and has probative value relevant to the issue of undue influence. Egli v. Hutton,135 Or. 175, 294 P. 347.
Ordinarily, a declaration of a testator not made as a part of the res gestae is not of itself substantive evidence of the truth of the matter so stated and is not admissible to show undue influence. Wayne v. Huber, 134 Or. 464, 291 P. 356, 294 P. 590, 79 A.L.R. 1427 (exhaustive note). In the instant case there is evidence *Page 656 
independent of the declarations of the decedent tending to show undue influence.
Undue influence is a species of fraud and is rarely susceptible of direct proof. Those who undertake to substitute their will for that of a testator ordinarily operate in secrecy. Evidence has a wide range in cases wherein undue influence is charged. The court in determining such issue must take into consideration all the facts and circumstances surrounding the execution of the will. It is deemed unnecessary further to state the fundamental principles of law applicable to cases involving the charge of undue influence, as they have been announced by this court many times.
We have carefully considered the record and are convinced that the evidence is sufficient to sustain the charge that the will challenged was executed as a result of undue influence. We are not prepared to say what our conclusion would be if those charged with having exercised undue influence had testified. It is, indeed, unsatisfactory to determine a cause on the merits on an incomplete record.
While in such a case it is not mandatory for an appellate court in equity to remand a cause for the purpose of taking additional testimony and thereby completing the record, we think it may in the interest of justice do so. Orsen v. Siegle, 170 Or. 153,132 P.2d 409, and authorities therein cited.
Counsel on both sides were material witnesses at the trial of this case in the Circuit Court. The circumstances were such that when the case was called for argument here, the court considered it inadvisable to enforce Canon 19 of the Canons of Professional Ethics of the American Bar Association, which provides that when a lawyer is a witness for his client, except as to *Page 657 
merely formal matters such as attestation or custody of an instrument or the like, he shall leave the trial of the case to other counsel. Canon 19, together with the other provisions of the Canons of Professional Ethics of the American Bar Association, has been commended to the profession by the Oregon State Bar, and the substance of Canon 19 was adopted as a rule of this court on December 29, 1949. Except for manifestly adequate reasons, there will be no relaxation of this rule in future cases. Counsel who have been material witnesses below will not be permitted to present the case here; and they should leave to other counsel the trial of the case in the Circuit Court. See Inre Torstensen's Estate, 28 Wn.2d 837, 862, 184 P.2d 255.
The decree of the Circuit Court is reversed and the cause remanded with directions to permit both parties to offer additional evidence if they care to do so. If no further evidence is introduced, the court should enter a decree setting aside and holding for naught the will upon which this contest is based; if additional evidence is introduced, the court should consider the record in its entirety and enter a decree warranted thereby. Contestant is entitled to costs and disbursements. *Page 658