Argued May 31; affirmed June 27, 1950

IN RE GEORGE W. JACKSON ESTATE
MESSINGER and JACKSON *v.* WEDDLE

220 P. (2d) 96

*B. G. Skulason,* of Portland, argued the cause and filed briefs for appellant.

*Joe P. Price,* of Portland, argued the cause for respondents. With him on the briefs were Hollister & Hollister, of Portland.

Before LUSK, Chief Justice, and BRAND, BELT, ROSS-MAN and HAY, Justices.

BELT, J.

This is an appeal from a decree setting aside as void an instrument dated August 28, 1947, purporting to be the last will and testament of George W. Jackson, Sr., deceased, on the ground that it was executed as a result of undue influence and an insane delusion. It was also decreed that an instrument dated April 18, 1946, was the last will and testament of the above named deceased and that it be admitted to probate.

The law applicable to the issues is so well settled that we see no need to restate it. *Newman v. Stover,* 187 Or. 641, 213 P. (2d) 137; *Allen v. Breding,* 181 Or. 332, 181 P. (2d) 783; *In re Walther's Estate,* 177 Or. 382, 163 P. (2d) 285; *In re Rupert's Estate,* 152 Or. 649, 54 P. (2d) 274; *In re Kelly's Estate,* 150 Or. 598, 46 P. (2d) 84; *In re Stephenson's Estate,* 132 Or. 234, 285 P. 224; *In re Estate of Allen,* 116 Or. 467, 241 P. 996; *In re Sturtevant's Estate,* 92 Or. 269, 178 P. 192, 180 P. 595; *Potter v. Jones,* 20 Or. 239, 25 P. 769, 12 L. R. A. 161; note, 154 A. L. R. 583. These authorities are cited not for the reason that the facts involved therein are similar to the facts in this record, but rather for the exposition of the controlling legal principles with which we are concerned. The decision in this case hinges solely on a question of fact. Was the instrument in question the product of testator's free and voluntary act? Or did the chief beneficiary substitute her will for that of the testator?

The facts out of which this bitter and unfortunate controversy arose are as follows: George W. Jackson,

Sr., who was eighty-five years of age, died in the city of Portland on the 6th day of September, 1948, leaving surviving him as his sole heirs at law a son, George W. Jackson, Jr., and a daughter, Mrs. Edythe L. Messinger. Testator and his wife, who predeceased him in January, 1947, executed reciprocal wills on the 18th day of April, 1946, whereby their estates were devised and bequeathed to their two children share and share alike. In the contested will, which was set aside and held to be void, the son and daughter were each bequeathed the sum of $5.00, and the remainder of the estate, approximating $20,000.00 in value—exclusive of $40,000.00 in Government bonds hereinafter mentioned—was devised and bequeathed to Pearl Coleman Weddle, sister of testator's wife.

It is conceded that prior to the death of Mrs. Jackson, peace and harmony reigned in the Jackson household. Testator was very proud of his son, who was a major in the United States Army and had served his country overseas, as he was of his only grandchild, Joan, a daughter of his son. The children were constant visitors in the Jackson home. Mrs. Pearl Coleman Weddle—the chief beneficiary under the purported will—had been married five times and no doubt had a rather hectic and unstable life. She is about fifty-five years of age. Pearl and her last husband lived in a trailer in California and moved about from place to place to work in harvesting the various crops. After coming to Portland, Pearl and her husband lived in their trailer parked in the lot where her sister, Mrs. Angeline McGraw, had her home. We appreciate the fact that it is no disgrace to live in a trailer —there is often more "real happiness in a peasant's hut than in a prince's palace"—but we advert to this

circumstance merely as a part of the background of the case.

When Mrs. Jackson died, trouble immediately arose between Pearl and the children of the decedent. That Pearl was a trouble maker and somewhat brazen is evidenced by the fact that she became involved in a heated controversy with the son concerning the kind of dress that his mother was to wear as her burial shroud. The son told Pearl, in effect, to mind her own business, and she retaliated by calling him a name too vile to print. Pearl, who had not been in the Jackson household since 1938, was employed at $25.00 per week to take care of Mrs. Jackson during her last illness. She did such work four days before Mrs. Jackson died. Pearl insisted that there was no agreement as to payment for her services and that she knew nothing about such matter, but in this respect she was contradicted by her husband, who said that he had informed her about her compensation and had refused to let her work for a lesser amount previously offered. Pearl states that she found the household in a filthy condition, that there was no food in the refrigerator, that the bedding used by Mrs. Jackson was foul and dirty, and that the clothing of Mr. Jackson, Sr., and the mattress upon which he slept were soaked with urine. Effie Smithline, a graduate nurse of St. Vincent's Hospital in Portland who took care of Mrs. Jackson for eight days prior to her death, absolutely refuted Pearl's testimony in reference to such conditions. We think the nurse was telling the truth.

After Mrs. Jackson died, Pearl "took over" and stayed with the testator in his home for a period of four months. The husband of Pearl also had his meals and slept in the Jackson home. Mrs. Messinger, the

daughter, desired to have her father use a basement apartment in her home in Portland, but he refused to go unless he could bring Pearl to look after him. The daughter objected to such an arrangement. Pearl had testator move to the home of her sister, where he lived until he broke his hip and was confined in the hospital, where he died September 6, 1948. While testator was in the hospital, Pearl gave instructions to the nurse in charge not to let the daughter or son in to see their father and not "to have any papers signed." Pearl, however, held the testator's hand while he signed a check for $200.00 and one for $25.00 in her favor.

Pearl testified that while testator was living at her sister's home, he did not have sufficient funds to take care of his needs. Yet, the uncontradicted evidence is that testator was being paid $25.00 per week from his wife's estate—which checks, after endorsement, Pearl cashed. Pearl admitted that she cashed two checks, each in the sum of $500.00, which testator received as payment of interest on the bonds. Testator also had monthly rentals between $300.00 and $400.00. Yet, all of this money was expended in the course of a few months. Where did it go?

At this juncture it is perhaps well to discuss the trouble that arose between the testator and his children over the right to possession of the Government bonds above mentioned. Testator sold a farm for $40,000.00 in cash and invested the money in four United States Government bonds, each in the sum of $10,000.00, payable to him or his wife. After his wife died, testator, accompanied by his son, went to the United States National Bank at Portland and made application to have two of the bonds reissued payable to him or his daughter and the other two to him or his

son. The bonds in due course were reissued in accordance with the above application and returned to the son, who deposited them in his safe deposit box at the bank. The interest on the bonds—amounting to $500.00 every six months—was, in keeping with directions of the son, sent directly by the Government to the father, who was satisfied with only the income from the bonds. David M. Cameron, assistant cashier of the bank, witnessed the application for the reissuance of the bonds and testified that it was a "voluntary transaction on the part of the old gent," whom he had known for many years. Mr. Cameron also testified that testator had the bonds in his possession when he brought them to the bank.

Later, when the testator had come under the spell and charm of Pearl, he accused his son of stealing the bonds and threatened to send him to the penitentiary, although there was no reasonable basis in fact for such an accusation. He also threatened his son with a six-shooter—which he was frantically waving around—unless the bonds were returned. It was the testator who brought the bonds to the bank, and not the son.

During the months of February, March and April, 1947, there developed a bitter controversy between the father and his son concerning the bonds. The father wanted one of the bonds ($10,000.00) for the purpose of buying an automobile and taking the Weddles on a trip to California. Jackson, Sr., also wanted his son to return one or more of the bonds, as he proposed to engage in a business enterprise with Pearl's husband in constructing ten tourist cabins in California. Pearl's husband had no financial standing and owned no real property. Frank Weddle and his wife on July 8, 1947, borrowed $250.00 from testator

on a note secured by a chattel mortgage on the trailer in which they lived. The testator made numerous demands on his son for a return of the bonds and, upon his refusal to comply, became more and more bitter toward him. The son, in our opinion, had good reason to believe that Pearl and her husband—to say nothing of Mrs. Angeline McGraw—would be the beneficiaries of such a transaction and not his father. A replevin action was commenced to recover possession of the bonds, but that cause was never heard since no jurisdiction was obtained over the defendant, Jackson, Jr. In April, 1947, a guardianship proceeding—consented to by the father—was commenced by the children but when the father withdrew his consent, the cause after hearing on the merits was dismissed. Testator became convinced that his children were going to have him declared "crazy" and rob him of his property. What testator's son and daughter were really trying to do was to protect him against the evil design of a woman who, with her husband, was bent on "getting the old man's money." It is apparent that this arthritic old man—who went about with a cane and crutch— was not able to stand up against the wiles of this woman. She in all probability knew that he was vulnerable to her charms and was so much putty in her hands. Mrs. Messinger testified to a conversation she had with her father after her mother died regarding her mother's diamond rings. She said that her father took hold of Pearl's hand and said: " 'Look at this poor little girl sitting around without any diamonds on her hand. I want you to give her mother's.' " Emmett Messinger, who is Edythe's husband, testified that about two or three weeks after Mrs. Jackson died, he came unexpectedly through the back door of the Jackson home and found Pearl not fully clad lying

on the bed with his wife's father. Edythe testified about seeing Pearl try on some new stockings in the presence of her father which he had bought for her and that she "had her dress up around her hips, with her legs stuck out." It is unreasonable that any illicit relationship existed between the testator and Pearl, but we are not prepared to say that such "bedroom antics" by Pearl did not have something to do in causing this old man to make an unnatural will disinheriting his children.

When the testator owned the farm on Sauvie's Island, the title thereto was taken in the name of his daughter. Later, when the father contemplated making some business transaction, he requested the Messingers to execute a blank deed, which they did in 1942, without describing any property. It was understood that if no deal were made, the father would destroy the blank deed. In April, 1947, the Messingers learned that a deed had been recorded on the 8th day of the month, wherein Pearl Coleman was named as grantee, purporting to convey to her their home in Portland, which had been given to them by Jackson, Sr., and his wife on July 9, 1946, and on which the Messingers had expended $2,500.00 in improvements. At the time this deed was recorded, Pearl was married to her present husband, Frank Weddle. She claims that she does not know how her name happened to be inserted in the deed as grantee. This deed—which was not introduced in evidence—was set aside in a suit instituted by the Messingers. We know not who was the party defendant. If the decedent caused the name of Pearl Coleman to be inserted in the deed, it tends further to show the influence that she exerted over him.

The contested will was executed in the office of Mr. S. A. Wold, an attorney at law in Portland. The testator was accompanied to the office by Pearl Weddle's husband. Mr. Weddle was in the room at the time the will was signed and said that he heard the word "will" mentioned a couple of times, but that he was looking out the window and "didn't know whose will it was, whether it was to his children or his nephew or who." Mr. Weddle testified that it was on the day Jackson was buried that he first learned that a will had been made in favor of his wife. The will was filed on the day before the testator was buried. After the will was executed, Mr. Wold said that he kept it in his office for about one month and then, at the request of the testator, forwarded it to him in an envelope on which was marked in large letters, "Last Will & Testament George W. Jackson, Sr." Pearl testified that she "put the will in the ledger that was under his bed," that she never handled it after that or opened the envelope, and that she never knew the contents of the will. She asserts that she never conversed with testator about the disposition of his property or the making of any will. Pearl was living at Rhododendron, about forty miles distant from Portland, when the testator died. When she learned of his death, she came to Portland immediately and went to the office of Mr. Wold, and it was there that she first learned about the making of the will. On the following morning she took the envelope containing the will to Mr. Wold's office and states that she then and there took the will out of the sealed envelope. Mr. Wold testified that the will was not in the envelope at the time Pearl brought it to him.

■ We agree with appellant, although the question is

a close one, that the evidence does not justify a finding that the will was the result of an insane delusion. The mere fact that testator was palpably wrong in concluding that his son was intending to steal his bonds does not constitute an insane delusion. We can not say that there is no evidence to furnish a basis for the belief that the testator entertained in reference to his bonds. *In re Sturtevant's Estate,* supra, quoted with approval in *In re Stephenson's Estate,* supra. The decision in this case is based on the charge of undue influence.

■ The able and experienced trial Judge, who had the advantage of seeing and hearing the witnesses, was convinced that the contested will reflected the will of the chief beneficiary and not that of the testator. We adopt the conclusion of the trial judge thus expressed in his memorandum opinion:

> "I am satisfied this 84-85 year old man's attitude was influenced by respondent, regardless of her protestations to the contrary, and while the refusal to turn over the bond, the appointment of a guardian, the incident over the gift of the house to Pearl, and the replevin suit would suggest reason for his altered attitude, the fact remains each progressive phase in the development of the situation was induced by Weddle influence promoting directly or indirectly the delusion of dishonesty and theft. All these incidents derive from Weddle effort to secure the old man's funds, the very proper thwarting by the children, resentment and misrepresentation, actual or implicit, in their relations to him."

Undue influence is a species of fraud, and it is rare indeed when it can be established by direct proof. Those who are actuated by evil motives generally operate in the dark. What brought about the changed

mental attitude of the testator toward his children? In 1946, the father reflected in his will the natural objects of his bounty. In 1947, he disinherited his children. *Newman v. Stover,* supra. It is argued that the reason for his changed attitude was due to the refusal of his son to surrender possession of the bonds. We are more inclined to think that it was not the father who really desired to have possession of the bonds, but it was Pearl and her husband who desired him to have them so that they could be converted into cash. We have carefully considered the entire record in this case and are convinced that the purported will upon which the appellant relies must be set aside as void on the ground that it is the product of undue influence.

The decree of the circuit court is affirmed.