Argued June 6, affirmed as modified and remanded December 31, 1973, petition for rehearing denied January 29, 1974

## FRANKLAND ET AL, *Respondents, v.* CITY OF LAKE OSWEGO ET AL, *Petitioners.*

517 P2d 1042

*Gerson F. Goldsmith,* Portland, argued the cause for petitioners. With him on the briefs for petitioner Mountain Park Corporation were J. Brad Littlefield, and Goldsmith, Siegel & Engel, Portland.

Also on the briefs were Garry P. McMurry, Patric J. Doherty, and McMurry, Sherry & Nichols, Portland, for petitioners City of Lake Oswego and John C. MacLean, H. J. Fergusen, William Cook, Robert Dent, Mary Goodall, William Knowles, and Charles Needham;

Kenneth W. Baines, and Wheelock, Richardson, Niehaus, Baines & Murphy, Portland, for petitioner Dave Christensen, Inc.; and

David J. Krieger, and Black, Kendall, Tremaine, Boothe & Higgins, Portland, for petitioner Security Bank of Oregon.

*David P. Templeton,* Portland, argued the cause for respondents. With him on the briefs were Charles Robinowitz, Robert E. Glasgow, and Dusenbery, Martin, Bischoff & Templeton, Portland.

Whitaker & Whitaker, Portland, filed an amicus curiae brief on behalf of The Homebuilders Association of Metropolitan Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, TONGUE and HOWELL, Justices.

HOWELL, J.

Plaintiffs filed this action for a declaratory judgment seeking an injunction or, alternatively, an award of monetary damages as remedies for the construction of an apartment building by the defendant Dave Christensen, Inc. At the close of plaintiffs' case, the trial court allowed defendants' motion to dismiss. On appeal, the Court of Appeals reversed and remanded the case to the trial court, 8 Or App 224, 493 P2d 163 (1972). We granted review.

The plaintiffs, adjoining property owners, challenge the validity of the construction of the apartment building which was erected pursuant to a planned unit development ordinance enacted by the City of Lake Oswego. Plaintiffs contend that the construction was not accomplished according to the planned unit development plan as submitted to the City, and that they are entitled to have the apartment building removed or be awarded damages for the depreciation in value of their property resulting from such construction.

We adopt a portion of the opinion of the Court of Appeals which states the background and the facts leading up to the filing of this suit.

In 1967 various entities in which Carl Halvorson had a dominant interest acquired the right to purchase the property designated (B) and (C) in the accompanying map (hereinafter the Kerr property). The segment of the Kerr property around which this suit revolves is in Multnomah County and lies north of the

east-west Clackamas-Multnomah county line and is designated (B) on the map. It is separated by a dotted line from the balance of the Kerr property, marked (C) on the accompanying map. This land was undeveloped. Plaintiffs live or own property on the strip of land immediately west of (B), extending southward from Stephenson Street and designated (A) (hereinafter called Arrowood). Arrowood was substantially developed with single family residences. Immediately east of (B) is other land, not involved here, which also was developed with single family residences.

Prior to the events which led to this litigation, all of the land mentioned above which lay in Multnomah County had been zoned under a comprehensive plan as R-20—single family residential—upon which residences could be built only if the lot occupied an area of 20,000 square feet or more. Arrowood had been annexed to the City of Portland several years earlier and remained zoned by Portland for single family residences. The accompanying map illustrates that Arrowood is surrounded by the Kerr property except for its northerly tip. Conversely, the strip of land in controversy, (B), is surrounded by and a part of land which already had been comprehensively zoned single family residential, except for its southerly tip.

When Carl Halvorson acquired the right to purchase the Kerr property in 1967, he embarked upon a plan for developing approximately 600 acres into what is termed a "Planned Unit Development" (hereinafter called PUD). This development includes a town center, commercial area, park, equestrian and other recreational facilities, and areas for garden apartments, town houses, duplexes, single family dwellings, etc. Defendant Mountain Park Corporation, of which Mr. Halvor-

son was the dominant owner, took title to the land and began the development. In order to obtain a water supply and sewer system, as well as other city services, negotiations were carried on with various municipal corporations. Mountain Park concluded that the best opportunity for development conforming to its own plans lay with the City of Lake Oswego (hereinafter called City). City, which was comprehensively zoned under a zoning code, passed an enabling ordinance permitting planned unit development in new areas. Negotiations ripened into a contract between City, Mountain Park, and Sylvania Properties, another of the entities dominated by Mr. Halvorson. The contract contemplated City would annex the PUD in phases. A section of the contract dealt with annexation and development. Its tenor is that City agreed to accept the PUD submitted by Mountain Park under its planned unit development ordinance (except for changes or amendments agreed upon by the City of Lake Oswego Planning Commission and Mountain Park) in return for annexation.

As contemplated by the contract, Mountain Park proposed annexation of Phases I, II and III of the PUD, and City annexed these areas; later, it annexed Phase IV consisting of 55 acres which included the controversial strip (B). Thereafter, it changed the zoning of Phase IV to allow, among other things, the building of apartments in the southerly part of strip (B) in accordance with the PUD plan submitted by Mountain Park.

Shortly after the rezoning, Mountain Park deeded 3.5 acres in the southerly part of Phase IV, (B), to defendant Dave Christensen, Inc. (hereinafter called Christensen). The latter obtained a commitment for

financing from defendant Security Bank of Oregon and submitted to Mountain Park (pursuant to a contract) suggested sketches of an apartment building or buildings which Christensen proposed to construct thereon. After Mountain Park rejected several proposals, it approved the plan effected for the construction of the apartment building, which is the subject of this litigation.

Plaintiffs, adjoining landowners, testified that they learned for the first time about the real bulk, size, and nature of the proposed apartment when Christensen's bulldozers arrived and stripped the area of trees and other vegetation and put in a fill 27 feet high toward the south end of strip (B). They protested by submitting a petition to the City Council on October 21, 1969. The Council referred the matter to the Planning Commission to determine whether the proposed structure was in conformance with the final plan. On November 4, 1969, the Planning Commission ruled against the plaintiffs. City issued a temporary building permit. Thereafter, on November 20, after having previously warned the defendants in writing of such intention, plaintiffs brought this suit. On November 21, City issued a final building permit.[①]

The Court of Appeals held that the portion of the

---

[①] During the pendency of this suit the trial court issued an interim order which declared the annexation of Phase IV invalid and therefore declared that the City acted without jurisdiction when it rezoned that area. Subsequently, the City reannexed and rezoned Phase IV. These actions were taken after giving the requisite notice and hearing demanded under the statute, but we have no record of what transpired at these hearings.

Because this second approval was apparently merely *pro forma* to remedy a procedural defect concerning the annexation of the area, our focus shall be on the procedures, requirements, and approvals given in 1969 as part of the original proceeding.

PUD ordinance annexing Phase IV which included the 3.5 acres adjacent to plaintiffs' property was invalid because insufficient or no consideration was given to plaintiffs' property and its single family use. The court quoted *Roseta v. County of Washington,* 254 Or 161, 458 P2d 405, 40 ALR3d 364 (1969), and *Smith v. County of Washington,* 241 Or 380, 406 P2d 545 (1965), to the effect that a change of zoning must first consider whether any changes have occurred in the neighborhood and whether the changes are consistent with the original comprehensive plan. The trial court, on the other hand, used the test of whether the City acted arbitrarily in enacting the PUD ordinance.

Subsequent to the trial of the instant case, and the decisions in *Roseta* and *Smith,* this court decided *Fasano v. Washington Co. Comm.,* 264 Or 574, 507 P2d 23 (1973). There, we stated that the burden of proof is upon the one seeking the change and that it is necessary that a record be made before the local governing body when a change is under consideration.

Because the case at bar was tried before our decision in *Fasano,* we do not have the benefit of any record before the City Council and do not know what factors were considered by the Council in enacting the PUD ordinance annexing Phase IV.

It is not necessary, however, that we attempt to decide whether sufficient consideration was given to plaintiffs' properties in annexing Phase IV because we find that the final plan was violated by the construction of the apartment house in question.

Because this case involves a planned unit development concept as a zoning device, we shall first generally

describe its characteristics and differentiate it from other more traditional concepts of zoning.

## THE PLANNED UNIT DEVELOPMENT CONCEPT

The concept of a planned unit development was initiated by planners and public officials to remedy the defects in traditional zoning theory and practice.[2] While not a new concept,[3] it has been only in recent years that zoning authorities have made this option practicable to planners and developers by providing enabling ordinances allowing such development.[4]

---

[2] Prior to the advent of the concept of zoning as a means to restrict and control the private use of land by public officials, a landowner was entitled to make improvements upon and to use land without restriction. With the arrival of the twentieth century, however, state and municipal governments became increasingly aware of the need for some controls and planning to ensure growth which would tend to ameliorate the blight and decay which infected urban communities at that time. 1 Anderson, American Law of Zoning 5, § 1.02 (1968). The legal framework which was proposed and utilized to effectuate this awareness took the form of zoning regulations by districts under the police power of set-backs, the height, bulk, and use of buildings, the use of land, and the density of population. Bassett, Zoning 45 (1936). Further, most state enabling acts for zoning required that these regulations be uniform throughout the district for buildings constructed therein. Bassett, supra.

The unfortunate and unintended effect of these regulations was to create "cookie cutter" developments in which all houses in a residential district resembled one another in architectural style, set-backs, and yard sizes. Also, no "incompatible" uses such as commercial centers or multi-family dwellings were allowed in a residential district unless they had existed prior to the zoning. Finally, because development was left to market forces, no provision could be made for the preservation of open space or public areas. See Krasnowiecki, Planned Unit Development: A Challenge to Established Theory and Practice of Land Use Control, 114 Pa L Rev 47 (1965).

[3] See 7 Regional Survey of New York and Its Environs, Law of Planning Unbuilt Areas, Part II, 272-73 (1929).

[4] See Urban Land, New Approaches to Residential Land Development (Tech Bull 40, 1961).

The objectives of planned unit developments are: (1) to achieve flexibility; (2) to provide a more desirable living environment than would be possible through the strict application of zoning ordinance requirements; (3) to encourage developers to use a more creative approach in their development of land; (4) to encourage a more efficient and more desirable use of open land; and (5) to encourage variety in the physical development pattern of the city.[6]

We agree that a planned unit development which is well conceived and well designed will achieve these objectives. However, while the primary benefits of a PUD ordinance are flexibility in design and improved development and use of land areas, these objectives can be secured only if the planning authority retains its control by, at a minimum, overseeing and approving general development plans of a developer. *See* Krasnowiecki, Planned Unit Development: A Challenge to Established Theory and Practice of Land Use Control, 114 Pa L Rev 47, 79-88 (1965); Mandelker, Reflections on the American System of Planning Controls: A Response to Professor Krasnowiecki, 114 Pa L Rev 98, 99, 101-104 (1965). The planned unit development concept necessarily allows for a great deal of discretion in the hands of planning authorities in implementing a PUD ordinance, but that discretion is properly in their hands and not those of the developers. Obviously, in order to guarantee a well conceived and well designed planned unit development, the planning authorities must have the necessary plans and information from the developer before making a decision. Once approved, the developer should be bound by the plans unless any changes are

[6] Id; *see also* Symposium: Planned Unit Development, 114 Pa L Rev 3-170 (1965); Cheney v. Village 2 at New Hope, Inc., 429 Pa 626, 241 A2d 81, 83 (1968).

approved by the planning authorities in accordance with the PUD ordinance.

## THE LAKE OSWEGO P.U.D. ORDINANCE

The ordinance delineates the procedure to be followed for a planned unit development:

The developer is required to submit to the Planning Commission a preliminary plan showing *inter alia* the building types and coverage of the real property, the proposed land use and densities, open spaces, and vehicular and pedestrian traffic plans. After submission of the preliminary plan, the City Planning Director is required to submit to the Planning Commission a staff report showing the existing zoning of the subject property and the "adjoining properties within or without the boundaries" of the City, plus comments on the proposed PUD.

After receiving the Planning Director's report, the Planning Commission is required to hold a public hearing on the application. After the hearing, the Planning Commission may approve in principle the preliminary plan, modify or reject it. Within six months from approval of the preliminary plan, the developer is required to file a final development plan showing land use, contours and drainage, traffic circulation, and landscaping. Section 53.330 of the PUD ordinance also requires, as part of the final plan, the submission of architectural sketches of the buildings proposed to be built in the PUD area. That section of the ordinance which is important to this case states:

"53.330. In planned-unit developments containing less than twenty-five acres the developer shall submit preliminary architectural sketches depicting the types of buildings and their approximate location on lots. The sketches to also depict the

general height, bulk and type of construction and proximity of structures on lots.

"In planned-unit developments containing more than twenty-five acres the developer shall submit architectural sketches as required above for each phase of development containing less than twenty-five acres before the time such phase begins actual construction. For a planned-unit development or phase thereof in excess of twenty-five acres the developer shall submit architectural sketches depicting the types of buildings (single family, duplex, multi-family, commercial, etc.) and their prospective locations in the development showing their general height and bulk in relationship to the other improvements in the development and upon adjacent land."

At the time the applicant submits his final development plan, he is required to submit an application for a zone change. Thereafter, after notice is given, a public meeting is held and the Planning Commission considers the final plan and application for a zone change.

Finally, the City Council, after notice, holds a public hearing on the final plan and zone change, and if the Council approves the plan and change, an ordinance to that effect is adopted. The developer is then required to file with the City Recorder and the City Planning Director the final approved development plan.

## DEFENDANTS' VIOLATIONS OF THE P.U.D. ORDINANCE

Section 53.330 of the PUD ordinance requires, *inter alia,* a developer to submit architectural sketches showing the type of buildings to be constructed, their prospective locations in the development, and their general height and bulk characteristics.

■ Implicit in this requirement is that the developer build in accordance with these sketches so that the City's approval of the sketches acts as a device to control development. Thus, if a developer fails to comply with the sketches he has submitted, he is in non-compliance with the final plan and the zoning ordinance which was passed to implement that final plan.

In this case the totality of the information submitted, which was apparently directed at compliance with Section 53.330, was two sketches of apartment buildings, a generalized development map showing that the area in question was to contain 246 "garden apartments," and a brochure which contained the following statement relating to garden apartments:

> "Phase four contains 246 garden apartments on two sites containing 12.3 acres just above McNary Parkway. The design of these units will be similar to those in Phase one. The unit will vary in size from 900 square feet to 1500 square feet with the average rent approximately $225.00 per month."

■ The sketches submitted to the Planning Commission and the City Council, Exhibits 3 and 5, bear no resemblance, either generally or specifically, to the apartment building constructed. Exhibit 5 is a sketch showing a portion of a three-story apartment building on the right, a smaller portion of a similar building on the left, and in the center a two-story apartment building consisting of three apartments on each floor, the buildings having been separated by open space and a pool. Exhibit 3 shows an apartment building apparently five stories high at one end which resembles a tower, with the remainder of the apartments being substantially lower and more elongated, with only two levels.

EXHIBIT 3

EXHIBIT 5

The apartment actually constructed is a monolithic, large, gray rectangular building 375 feet long and 75 feet wide, with five stories at one end and four stories at the other.

The witnesses agreed that the apartment constructed was a departure from the sketches submitted.

The Chairman of the Lake Oswego Planning Commission, while he did not vote at the hearing of the Commission in November, 1969, testified that the apartment did not conform to the sketches presented because of its difference in size, height, and bulk.

The Lake Oswego City Planning Director testified that the building was a "departure" from the drawings submitted, but that in relation to its height and bulk there was "room for definition."

Mr. Nelson, a representative of Mountain Park Corp., admitted that the exhibits shown the Planning Commission were not a "direct portrayal" of "what the actual structure turned out to be."

The map which depicts what Phase IV will contain shows only that "garden apartments" will be built in the area where the apartment in question was to be built, but does not show any height or bulk characteristics.

The record is not entirely clear as to whether any garden apartments had been constructed in Phase I, although the brochure had described the garden apartments in Phase IV to be similar to those in Phase I. However, it is clear from the evidence that nothing resembling the apartment constructed was built elsewhere in the development. The brochure states that 246 garden apartments are planned on two sites in 12.3

CHRISTENSEN APARTMENT

acres of Phase IV. Eighty of these 246 apartments are located in the building constructed. No information was given as to whether the other 166 apartments will consist of one building 10 stories high, or several buildings of two stories, or where they will be located in the area. The same uncertainty still existed at the time of trial. Christensen, who built the present apartment building and intended to construct at least one more, testified that he did not know what the height of the second apartment building would be, and that he had merely "squared off an area similar to the first building" as a preliminary step to construction of that apartment.

The record also discloses that after the City Council had approved the final plans, enacted the PUD ordinance, and allowed the zone change, Mountain Park and Christensen were still negotiating between themselves as to the type of apartment building to be constructed.

We conclude that the defendants Mountain Park and Christensen failed to build the apartment in accordance with the final plan submitted pursuant to Section 53.330 of the ordinance.[6]

A requirement in a PUD ordinance that a developer submit final plans showing with some particularity the various features involved in his planned unit development, and that thereafter he is bound to these plans, serves at least two desirable purposes. First, it gives the planning authorities and the City Council full knowledge of what they are asked to approve before they grant a zone change. Secondly, it gives any oppo-

---

[6] Our conclusion from examining the record is in complete agreement with the following statement of the trial judge: "Nobody ever really knew what Mr. Christensen was going to put up, did they?"

nent complete information about the project. It serves no worthwhile purpose for an ordinance to allow a full public hearing on a proposed planned unit development and zone change if the facts are not available. There is nothing to debate. Neither the opponents nor the proponents would know the issues, and the governing body charged with making a decision would be doing so in a vacuum. In so holding, we are aware of the need for flexibility in planning, but flexible planning does not, in our view, justify delegation of the planning function to a private developer, nor does it allow a developer to build without regard to plans as presented to the appropriate planning authorities.

In this case the defendants Mountain Park and Christensen presented Exhibits 3 and 5 and used the term "garden apartment" as definitional and descriptive vehicles to comply with Section 53.330. The term "garden apartment" is without any definitive meaning as shown by the various definitions presented at trial, and thus cannot be used as a tool for control of development. Exhibits 3 and 5, then, are the only bases from which a comparison with what was actually constructed can be made. Even assuming that these sketches alone would comply with the requirements of Section 53.330, as above described, there simply is no resemblance between those sketches and the Christensen apartment.

While it might be said that the term "sketches" in the ordinance should not be read so expansively,[7] we note that this is the only tool which the City can use

---

[7] We view the Lake Oswego ordinance as establishing a very minimal control as to the type, height, and bulk of structures to be built. We believe that it would be advantageous to the City, the developer, and the owners of adjacent property if the PUD ordinance would more explicitly delineate what the City must have before it prior to giving approval to a final plan of development.

to oversee the type, height, and bulk of structures to be built in advance of construction and thus has enhanced importance under the scheme of development envisaged by the general Lake Oswego PUD ordinance.[9] Therefore, because the Christensen apartment did not comply with the sketches submitted, that structure violated the final plan and the zoning ordinance which implemented that plan.

■ Defendants contend that the apartment constructed was in accordance with the plans submitted and that it was so declared by the Planning Commission.

In June, 1969, the City Council gave its approval to the final plans. Defendant Christensen then began excavation. When the plaintiffs saw the extent of the excavation and the large fill, they filed remonstrating petitions with the City Council. The City Council referred them to the Planning Commission. A "courtesy" public hearing was given to plaintiffs on November 4, 1969, and the Planning Commission decided that the apartment complied with the final development plan and gave its approval. Defendants argue that the decision of the Planning Commission should be given a presumption of validity. *Compare Murphy v. S. A. Hutchins & Assoc.*, 263 Or 245, 501 P2d 1273 (1972), with *Fasano v. Washington Co. Comm.*, supra.

The defendants' argument must fail because the Planning Commission's action on November 4, when they first saw and approved the plans of the apartment to be constructed, is without legal effect. That hearing was called only after objections arose from the plain-

---

[9] In so holding, we expressly reject the defendants' position that they did not need to submit specific sketches of what was to be built and therefore they were not bound to build in compliance therewith.

tiffs concerning the height and bulk of the proposed apartment and was deemed merely a courtesy hearing for their benefit. It was not part of the planning process, but only an *ad hoc* after-the-fact adjudication of the issue of whether the apartment complied with the architectural sketches submitted. Moreover, under the ordinance, it is the City Council and not the Planning Commission which must, as part of the approval of the final plan, review the types of buildings to be constructed. This approval is given after a public hearing where affected or interested individuals may inform the City Council of their concerns. To allow the Planning Commission to unilaterally alter the final plan when the developer subsequently prepares the actual plans for construction circumvents the ordinance's requirement of vesting final review in the City Council. *See generally, Millbrae Ass'n for Residential Survival v. City of Millbrae*, 262 Cal App 2d 222, 69 Cal Rptr 251 (1968).

The effect of the defendant Christensen's testimony is that he did not know what form future apartments would take, but whatever it may be, the form had already been approved by the Planning Commission. Approval of this procedure would render meaningless the requirement that final approval must come from the City Council after notice and a hearing have been afforded to interested parties.

■ We find, therefore, that under the ordinance a developer must submit sketches of actual structures to be built, and that he is thereafter bound by these plans and may later change them only by complying with the appropriate procedures delineated by the ordinance.[⊛]

---

[⊛] See Section 53.420 of the Lake Oswego ordinance.

## RIGHTS OF ADJOINING LANDOWNERS

The nature of the right of an adjoining landowner to bring suit to enjoin the violation of a zoning ordinance has been variously described by the courts, but all seem to reflect the policy consideration expressed in 3 Anderson, American Law of Zoning 636, § 23.11 (1968), where the author states:

> "Since many municipalities lack sufficient personnel to carry out an effective program of zoning inspection and enforcement, actions commenced by private persons to enjoin violation of the zoning ordinance are an important part of the enforcement program. In these actions, which are more numerous than those commenced by taxpayers or by municipalities, the person who institutes the proceedings acts in his private capacity, not as a taxpayer seeking to vindicate a taxpayer's interest in law enforcement. * * *"

Four theories have been advanced: (1) that a zoning ordinance is similar to a third party beneficiary contract; (2) that the zoning ordinance is similar to a covenant running with the land; (3) that the cause of action is similar to a nuisance action; and (4) that a zoning ordinance creates rights in favor of individuals as well as public authorities which are enforceable in a civil suit.

One of the theories underlying a suit by an adjoining landowner is that expressed in *Pritz v. Messer*, 112 Ohio St 628, 149 NE 30 (1925), where the Ohio Supreme Court drew an analogy between rights accruing to a third party beneficiary under a contract and the rights of adjoining landowners under a zoning ordinance. This theory was characterized as:

> "* * * We have here an application for injunction under a zoning ordinance which zones the entire

city for the benefit of the community. The benefit to be derived from the observance of these zoning regulations accrues, not only to the municipality, but to the abutting property owner. The plaintiff, therefore, as to her capacity to bring this suit, is in a position analogous to that of one for whose benefit a contract has been made by another party. Having a substantial interest in the enforcement of the zoning restrictions, she is a proper party to enforce their observance by a suit for injunction." 149 NE at 32.

A variant of this approach would analogize a covenant running with the land in a deed with a zoning ordinance. In *DeBlasiis v. Bartell*, 143 Pa Super 485, 18 A2d 478 (1941), the court said:

"* * * [T]he benefits flowing from the enactment of zoning regulations, *in return for the restrictions imposed by them*, accrue not only to the municipality, representing the general public, but also to the abutting property owners; and while their rights are not strictly *contractual* * * * they are, to a degree analogous to building restrictions, running with the land, imposed in a deed for the benefit of adjoining or adjacent property owners. * * *" (Emphasis in text.) 18 A2d at 481.

Another approach is identified in *Fitzgerald v. Merard Holding Co.*, 106 Conn 475, 138 A 483 (1927). There, the Supreme Court of Errors of Connecticut used the analogy of nuisance. Recognizing that the structure built in violation of the zoning ordinance was not a nuisance *per se*, the court held that a sufficient similarity existed between a nuisance *per accidens*[10] and the violation of the ordinance to permit

---

[10] A nuisance *per accidens* is an act, occupation or structure which is a nuisance only because of its location, surroundings, or manner of operation. Comment, The Effect of Zoning Ordinances on the Law of Nuisance, 54 Mich L Rev 266 (1955).

injunctive relief to lie in the plaintiff's favor. In so holding the court stated:

"* * * The erection of a structure, though it is not in itself a nuisance, becomes such when it is located in a place forbidden by law. * * *" 138 A at 486.

*See also McIvor v. Mercer-Fraser Co.,* 76 Cal App 2d 247, 172 P2d 758 (1946).

A fourth theory is expressed in *Sapiro v. Frisbie,* 93 Cal App 299, 270 P 280 (1928), where the California District Court of Appeals for the Third District held that a private cause of action accrues to injured landowners from the violation of a zoning ordinance. There, the defendants converted a residence into a funeral parlor in violation of a city ordinance and the plaintiffs, adjoining property owners, sued to recover for past damages to their property and to enjoin the defendants from future use of the premises in that manner. In so holding, the court said:

"The right of the plaintiffs to claim and recover damages for any injuries which they may have sustained, and may sustain pending the final disposition of this litigation, by reason of any depreciation in the value of their real property caused by the acts with the commission of which the complaint charges the defendants, seems to us to be a proposition which is not subject to serious controversy. It is a well-established and commonly recognized general rule that, where a right is given by statute or municipal ordinance to a particular class of persons and for their special protection, and not merely for the protection of the public at large, a liability is thereby created in favor of any such particular class as against any person who violates such right, and as a result injures the person or property of the former, which liability may be enforced by means of a civil action or civil remedy appropriate

to the circumstances peculiar to the particular case. * * *" 270 P at 282.

*See also Cook v. Normac Corp.,* 176 Md 394, 4 A2d 747 (1939); 58 Am Jur 1044, Zoning § 191; 50 Am Jur 578, Statutes § 584; *compare Smith v. Home Echo Club et al,* 69 NE2d 414 (Ohio Ct App 1943). This concept also takes the form of the maxim, "Ubi jus, ibi remedium." (Where there is a right, there is a remedy.)

Finally, in *Nestle v. City of Santa Monica,* 6 Cal 3d 920, 101 Cal Rptr 568, 496 P2d 480, 493 (1972), the California Supreme Court said:

"* * * In general the concept is long-standing that a private person who suffers identifiable harm by reason of a violation of a municipal zoning law may sue the violator for compensatory damages and may also seek injunctive relief when applicable. * * *"

This statement reflects the recognition that, regardless of the theory used, it is well recognized that adjoining landowners may sue to enjoin the violation of a zoning ordinance. *See also* 8 McQuillin, Municipal Corporations 487, § 25.153 (3d ed 1965); 3 Anderson, supra at 566, § 21.10; 3 Rathkopf, The Law of Zoning and Planning 66-19, § 9; 3 Yokley, Zoning Law and Practice 14, § 22-5 (3d ed 1967). It is not necessary for us to decide which theory is appropriate as the defendants recognize the ability of adjoining landowners to bring such a suit and have not contended otherwise.

## REMEDIES

The Court of Appeals remanded this suit to the circuit court for a decision whether a mandatory injunction should issue ordering removal of the apartment building or whether the plaintiffs should be

awarded damages. In doing so, the Court of Appeals also held that evidence of a loss of view by plaintiffs was properly admissible as an element of damage.

■■ The law is well established that the landowner is entitled to maintain an action to enjoin a violation of a zoning regulation where such violation will reduce the use value of his property. 3 Anderson, supra at 638, § 23.11. *See also* 3 Yokley, supra at 14, § 22-5. An injunction, as an exercise of equity power, is based on equitable principles. Under proper circumstances the court may order the cessation of a prohibited use of the property or demolition of the structure. *Welton v. 40.East Oak St. Bldg. Corp.*, 70 F2d 377 (7th Cir 1934); *McCavic v. DeLuca*, 233 Minn 372, 46 NW2d 873 (1951); *City of Beatrice v. Williams*, 172 Neb 889, 112 NW2d 16 (1961); 3 Rathkopf, supra at 66-25, § 10.

■ The court, in lieu of granting a mandatory injunction, may award damages to the adjoining owners for a depreciation in value of their property resulting from the ordinance violation. *Sapiro v. Frisbie*, supra; *Thompson v. Smith*, 119 Vt 488, 129 A2d 638 (1957). The latter case is very similar to the case at bar. There, the defendant, at a public hearing before the governing board, secured a zone change allowing the construction of a motel in an area zoned residential. However, approval to construct the motel was conditioned on the requirement that the motel be not less than 25 feet from the plaintiffs' property line. Subsequently, some members of the zoning board, without a hearing and without notice to plaintiffs, informally granted the defendants' request to reduce the clearance from 25 feet to 10 feet. After the motel was constructed the plaintiffs filed a suit for a mandatory injunction. The Supreme Court of Vermont held that the informal

variance was invalid for lack of notice and a hearing, and therefore the motel had been built in violation of the ordinance. The remaining issue was whether the plaintiffs were entitled to an injunction or damages. Balancing the relative injury to the plaintiffs against the relative hardship of removal on the defendants, the court allowed money damages in lieu of a mandatory injunction. The court stated:

> "* * * [P]roper resort to equity jurisdiction does not of necessity invoke the application of extraordinary and severe relief by way of a mandatory injunction. It is the duty of the court of chancery to consider and weigh the relative convenience or inconvenience, the relative injury sought to be cured as compared with the hardship of injunctive relief. 28 Am. Jur., Injunctions Sec. 54, p. 250. Such consideration may dictate an award of damages in lieu of injunction, and the doctrine has application to violations of building restrictions. Jackson v. Stevenson, 156 Mass. 496, 31 N.E. 691, 693; Amerman v. Deane, 132 N.Y. 355, 30 N.E. 741, 742. * * *" 129 A2d at 651-52.

■ The plaintiffs herein introduced evidence relating to a depreciation in the market value of their property, resulting from the construction of the apartment building. If property damages are to be awarded to plaintiffs, the damages should be measured by the depreciation in the value of plaintiffs' property which is attributable to the defendants' noncompliance with the final plan. The City could, pursuant to its police powers and after complying with proper procedures, act in the public interest to zone an area, resulting in the diminution of the value of property within or without the zoned area. In such a case, any damage to a landowner need not be compensated. *Euclid v. Ambler Realty Co.,* 272 US 365, 47 S Ct 114, 71 L Ed 303

(1926). Thus, in the instant case, the City did approve the submitted plans for an apartment building adjacent to plaintiffs' property. However, as we have stated, the building actually constructed bore no relationship to the plans submitted. As a result, the ordinance was violated.

In *Thompson v. Smith*, supra, the court recognized a concept of partial illegality when it held:

"* * * The plaintiffs are not entitled to a recovery of the full depreciation [in the market value of their property] caused by the construction of the motel on the lot adjoining, but only to such depreciation that resulted from the construction at an unauthorized proximity to the plaintiffs' property and beyond the limits prescribed by the ordinance. * * *" 129 A2d at 653.

We agree with this characterization of the measure of the plaintiffs' damages. Consequently, plaintiffs are not entitled to a recovery of the full depreciation of their property caused by the construction of the Christensen apartment, but only to such depreciation that resulted from the difference between the apartment constructed and the apartment represented in the sketches which had been approved by the City.[⑩]

## DISPOSITION OF CASE

■ The next issue is whether the cause should be remanded to the circuit court for the taking of additional evidence.

---

[⑩] Ordinarily, parking, traffic, noise, etc., are factors which may be considered in determining market value. 3 Anderson, American Law of Zoning 638-639, § 23.11; 5 Nichols on Eminent Domain 18-44, § 18.11 (3d ed 1969) *et seq.* However, in the instant case no damage should be included for those factors which would have been present in any event because the construction of an apartment building had been approved by the City.

The trial court entered a conclusion of law which stated that plaintiffs' evidence was insufficient as a matter of law to establish that the apartment building was in violation of the PUD ordinance. At the close of the trial, in allowing the defendants' motion to dismiss, the court stated that it did so because it could not find that the City acted arbitrarily or unreasonably. As a result the court did not pass upon the question of whether plaintiffs were entitled to an injunction or damages. Also, the defendants did not rest their case before moving for a dismissal, and consequently the defendants did not offer any evidence regarding damages, injunctive relief, or the defense of waiver, laches, or estoppel.

The specific question now presented is whether defendants are precluded from offering any evidence.

While this cause is a declaratory judgment action, it was tried, and properly so, as a suit in equity.

In *Newman v. Stover*, 187 Or 641, 213 P2d 137 (1950), an equity suit challenging the validity of a will, the trial court allowed the defendant's motion to dismiss made at the conclusion of plaintiff's case. We announced that it is "bad practice in equity for a defendant to move for a dismissal at the conclusion of the plaintiff's case," and that the trial court should have required the defendant to rest before considering his motion to dismiss. However, the suit was remanded for additional testimony "in the interest of justice."

In *In Re Estate of Andersen*, 192 Or 441, 235 P2d 869 (1951), we reiterated the rule of *Newman* that it is bad practice to move for a dismissal at the conclusion of plaintiff's case, but held the rule to be inapplicable where the party having the burden of

proof failed to establish his contention of undue influence. Having failed to sustain the burden of proof, a motion to dismiss was proper.

In *Karoblis v. Liebert,* 263 Or 64, 501 P2d 315 (1972), we stated that "the defendant in a law action tried to the court without a jury may not test the legal sufficiency of plaintiff's evidence at the close of plaintiff's case. If he wishes to challenge the sufficiency of the evidence he must rest his case and submit the matter to the court on its merits." In *Petersen v. Thompson,* 264 Or 516, 506 P2d 697 (1973), we reiterated the rule of *Karoblis,* but because *Petersen* was tried in the circuit court before the *Karoblis* decision, we remanded the action to require the defendant to put on his evidence or rest his case before moving for a nonsuit.

The case at bar was tried before our decision in *Karoblis.* Perhaps the bar should have been alerted by *Newman v. Stover,* supra, where we stated that a defendant in an equity suit should "close" his case before moving to dismiss. However, as we have previously mentioned, the defendant in *Newman* on the remand was allowed to put on his case. Later, in *In Re Estate of Andersen,* supra, the rule of *Newman* was held not applicable where one party fails to sustain his burden of proof.

We believe that we should follow the same procedure in the instant case as we did in the law action in *Petersen v. Thompson,* supra, and remand this suit to allow both parties to introduce evidence relating to the issue of which remedy—injunction or monetary damages—is proper. As a part of the proceedings, the plaintiffs and defendants will also be allowed to introduce

evidence relating to the issue of damages under the rules enunciated above. Finally, the defendants are allowed to offer any evidence relating to the defenses of waiver, laches and estoppel.

The decision of the Court of Appeals is affirmed as modified herein, and this cause is remanded to the circuit court for further proceedings consistent with this opinion.

O'CONNELL, C. J., dissenting.

The majority opinion disposes of this case upon a theory different from that employed either by the trial court or the Court of Appeals. This variation is not surpising in light of the ambiguous nature of plaintiffs' claim. Their initial request, directed to the Lake Oswego City Council, simply sought a reduction in the proposed size of the Christensen apartment building. Once their complaint was filed, however, this simplicity disappeared despite repeated attempts by the trial court to identify the theory upon which plaintiffs were proceeding. It appears that at times plaintiffs' attack was upon the validity of the PUD zoning for the entire project, at times upon the validity of the approval for the final plan for Phase IV, and at still other times on the conformity of the Christensen building to the final plan adopted by the city.

As a result, we find three different courts applying three different hypotheses in reaching a decision. The Court of Appeals rested its opinion upon the "change in circumstance" test set forth in *Roseta v. County of Washington*, 254 Or 161, 458 P2d 405, 40 ALR3d 364 (1969). The trial court, on the other hand, held that this test did not apply but that the test was "whether there has been a showing that the action

taken by the city and its planning commission was clearly unreasonable and arbitrary and had no substantial relation to the legitimate objects sought to be gained, that is, the furtherance of public health, morals, safety or welfare."

We now decide, apparently, that the case is to be disposed of on the ground that the construction of the Christensen apartment building violated the Lake Oswego PUD ordinance because it did not conform to the architectural sketches submitted as part of the Phase IV final plan.

The majority does not say that the Christensen apartment is incompatible with the general plan or subject to attack because it violates plaintiffs' claimed interest in the continuance of the single-family dwelling zone; the rationale is that the apartment building does not comport with the sketches. One cannot be sure from the majority opinion, but apparently the majority would hold that if sketches had been presented showing an apartment building having the design of this apartment building, it would have been legally constructed under a valid ordinance.

The principal vice of the opinion is that it magnifies out of all proportion one aspect of planning (the architectural design of a building) at the cost of many other more important considerations in formulating a good land use plan.

The architectural character of the Christensen apartment could not be looked upon as an isolated feature in framing the planned-unit development. All of the other features of the plan relating to traffic circulation, parking, drainage, sewage disposal, population pressure, open areas, etc., had to be considered

and, in fact, were thoroughly considered by both the city and the developers over the course of at least two years. We may assume also that both the city and the developers located all of the housing units, including this apartment, consistent with the best possible planning objectives, other than the possible objection to the architectural style of the Christensen apartment building. In addition, the city complied with all notice and hearing requirements prior to approving the plan. Thereafter, when plaintiffs challenged the construction of this building before the City Council, the council referred the matter to the planning commission. After plaintiffs had been given an opportunity to be heard, the commission, with the actual building blueprints before it, ruled that the Christensen apartment building was in compliance with the Phase IV plan. Lake Oswego Code 53.420 vests the planning commission with the authority to approve the kind of change alleged by plaintiffs, since it is empowered to approve any change in a final plan which does "not alter total density, ratio of dwelling unit types, boundaries of the planned-unit development or location or area of public spaces."①

---

①
    "53.420  Changes to final development plan.

    "The owner-applicant may make such changes in the approved final plan and program as are consistent with any subsequent subdivision plat approved by the planning commission, provided such changes do not alter total density, ratio of dwelling unit types, boundaries of the planned-unit development or location or area of public spaces. In the event a subdivision plat containing such changes is not submitted for approval to the planning commission, proposed changes to the approved final plan and program may be submitted in writing to the planning director for approval and amendment to the final plan and program on file with the city provided such changes do not alter dwelling unit density; do not alter the ratio of different types of dwelling units to each other; do not increase or change the type or location of commercial struc-

Inherent in this authority is the power to determine that no change has been made. Plaintiffs were given a hearing though none was required under Lake Oswego Code 53.420.[9]

As of the date of the planning commission's decision, actual construction had not begun, no building permits had been issued, no construction-related financial commitments had been finally made, and no litigation was pending. From this and the other matters recited above, it can be seen that there is no evidence in this record to justify the inference that the planning commission acted arbitrarily, capriciously, in bad

tures; do not change the boundaries of the planned-unit development and do not change the location and area of public open spaces and recreational area.

"Changes which alter or change dwelling unit density, ratio of number of different types of dwelling units, commercial uses, boundaries of the planned-unit development or affects location or area of open and recreational spaces shall be made in the form of a petition for approval of a new planned-unit development and shall be made in accordance with this article."

[9] At the hearing there was testimony to the effect that the Christensen building was a garden apartment. No record of the hearing exists because it took place prior to our decision in Fasano v. Washington County Comm., 264 Or 574, 507 P2d 23 (1973). Nevertheless, in the circuit court Carl Rohde, chairman of the Lake Oswego Planning Commission when the Christensen building was approved, gave the following account of certain testimony received at the courtesy hearing:

"* * * [A] garden apartment in quotation marks, is not defined in general acceptance in the architectural profession or in land management. And one of our members at that special hearing testified or stated that he had specifically looked at various developments around the country—he is an architect— and that he saw garden apartments that were several stories higher than this one and larger in bulk and he also saw garden apartments which were one or two story, three or four unit buildings so that in the absence of any specific legally or generally accepted definition of a term, we in the design profession or the architectural profession, say that we just do what we individually think is correct."

faith, or under the kind of pressure which precluded it from acting fairly. In this setting, its decision that the Christensen apartment building was a garden apartment should be conclusive.

I cannot join in an opinion which holds the entire planned-unit development scheme for Phase IV void because the final plan was somewhat indefinite with respect to the appearance of the structures designated as "garden apartments." This vagueness, I take it, would not be fatal to an ordinary Euclidean zoning ordinance. But, the opinion seems to say, because a planned-unit development by its nature is so flexible, there must be a crystallization of the plans prior to the enactment of the ordinance in order to avoid giving the developer carte blanche to construct any kind of a structure he pleases.

I repeat, to rest the validity of governmental action entirely upon the sufficiency of sketches overemphasizes a detail in the whole process of passing upon a land use plan. There is nothing in the PUD enabling ordinance requiring sketches showing specific architectural styles. It is consistent with the language of the ordinance to conclude that it contemplated only the conceptual portrayal of the type of building and its juxtaposition with other features of the plan, leaving the refinements of architectural style to be worked out sometime before actual construction begins.[9] The city must have assumed that the term

---

[9] Lake Oswego Code 53.330 provides in relevant part: "In planned-unit developments containing more than twenty-five acres the developer shall submit architectural sketches as required above [for developments less than twenty-five acres] for each phase of development containing less than twenty-five acres *before the time such phase begins actual construction.*" (Emphasis added.)

"garden apartments" had sufficient meaning to give it the necessary control over the kind of structure to be located in the designated area. The effect of our opinion is to say either that the term "garden apartment" has no meaning, or that if it does we, rather than the City Council, will decide which structures qualify under that term. We do not substitute our judgment for that of governmental agencies in other areas of the law; there is no reason for us to make an exception in case of zoning. The term "garden apartment" may be vague, but surely the planning commission is better equipped to apply it than is this court, and we have no right to second-guess or superimpose our judgment over that of the commission.