Argued and submitted May 4, Court of Appeals reversed;
trial court decree reinstated November 3, 1981

STATE ex rel COX,
*Respondent,*

*v.*

DAVIDSON INDUSTRIES, INC.,
*Petitioner.*

(No. 77-5311, CA 15484, SC 27541)

635 P2d 630

K. Patrick Neill, Eugene, argued the cause for petitioner. With him on the briefs were Hershner, Hunter, Miller, Moulton & Andrews, Eugene.

William F. Gary, Solicitor General, argued the cause for respondent. On the briefs were James M. Brown, Attorney General, Walter L. Barrie, Solicitor General, and James C. Rhodes, Assistant Attorney General, Salem.

DENECKE, C. J.

## DENECKE, C. J.

The defendant timber company placed a fill, to be used as a road, on property near the mouth of the Siuslaw River. The plaintiff Cox, Director of the Division of State Lands, brought this suit seeking a mandatory injunction requiring the defendant to remove the fill because the defendant built it without securing a permit from the Division. ORS 541.615 provides that no person "shall * * * fill any waters of this state without a permit issued under authority of the Director of the Division of State Lands * * *." The trial court held the plaintiff had not proved the fill was constructed upon the "waters of the State" and denied the plaintiff's request. The Court of Appeals reversed and instructed the trial court to issue the injunction. 49 Or App 657, 620 P2d 942 (1980).

Defendant contends that in attempting to prove that the fill was placed in "waters of this state" the plaintiff is limited to proving that the fill was placed in an "estuary" because that is what plaintiff alleged in his complaint. Plaintiff alleged more. Plaintiff alleged:

"III
"Siboco Slough is an arm of Siuslaw Bay, located in the NW1/4NE1/4, Section 31, Township 18 South, Range 11 West, Willamette Meridian, Lane County, Oregon; that Siboco Slough, an arm of the Siuslaw Bay, is a tidal bay.

"IV
During June and July 1977, defendant placed approximately 4,865 cubic yards of material in Siboco Slough for a distance of approximately 500 feet which formed a dike across the slough; the location of the dike is shown on Exhibit 'A' attached hereto and made a part hereof. The area behind the dike is salt marsh lands and are an important element of a productive estuary to provide organic nutrients and food organisms that enrich and sustain the estuarine food chain; that behind the dike were species of shiner perch, staghorn sculpins and stickle backs and other marine life.

"V
"Defendant has not secured a permit from the Division of State Lands to place the fill in the area shown on Exhibit 'A' [a rough sketch]; that a permit is required from the Division of State Lands to fill the tidal bay as shown on Exhibit 'A.' "

Under the pleadings, the plaintiff was entitled to prove that the fill was built in a "tidal bay," an "estuary" or on "salt marsh lands."[1]

The defendant also contends that the plaintiff did not prove that the place where the fill was built was in or on "the waters of this state."

The defendant completed the fill about July 1, 1977. At that time ORS 541.605(8) provided:

" 'Waters of this state' means natural waterways including all tidal and nontidal bays, constantly flowing streams, lakes and other bodies of water in this state, navigable and non-navigable, including that portion of the Pacific Ocean which is in the boundaries of this state."[2]

ORS 541.610(1) provides:

"The protection, conservation and best use of the water resources of this state are matters of the utmost public concern. Streams, lakes, bays, estuaries and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for fish, avenues for transportation and sites for commerce and public recreation, are vital to the economy and well-being of this state and its people. Unregulated removal of material from the beds and banks of the waters of this state may create hazards to the health, safety and welfare of the people of this state. Unregulated filling in the waters of this state for any purpose, may result in interfering with or injuring public navigation, fishery and recreational uses of the waters. In order to provide for the best possible use of the water resources of this state, it is desirable to centralize authority in the Director of the Division of State Lands, and implement control of the removal of material from the beds and banks or filling of the waters of this state."

Water resources are defined:

" 'Water resources' includes not only water itself but also aquatic life and habitats therein and all other natural resources in and under the waters of this state." ORS 541.605(11).

---

[1] A bay can be an estuary. The Oregon Division of Lands issued a publication, "Oregon Estuaries," in which the preamble states, "Estuaries - or bays if you prefer that term -."

[2] Ch 564, § 1(12), Oregon Laws 1979 added "intermittent."

The administrative rules promulgated by the Division of State Lands further defined "waters of this state." Oregon Administrative Rules (OAR) 141-85-100 provided:

" (8) 'Estuarine Lands' - those lands in the flood plain and the floodway fringe from the mouth of the estuary inland to the limit of tidal influence.

"* * * * *.

"(21) 'Salt Marsh' - the salt marsh is composed of those communities of vascular aquatic and semiaquatic vegetation rooted in poorly drained, poorly aerated soil which may contain varying concentrations of salt occurring from high water inland to the line of non-aquatic vegetation."

"* * * * *.

"(24) 'Waters of This State' - means natural waterways including all tidal and nontidal bays, estuaries, constantly flowing streams, rivers, creeks, lakes, and other bodies of water in this state, navigable and non-navigable, including that portion of the Pacific Ocean which is within the boundaries of this state but does not include man-made mill ponds, drainages, or irrigation ditches.

"* * * * *.

"(26) 'Wetlands' - swamps, marshes, and other land areas frequently covered by water to a depth great enough to limit vegetation to water-loving types not found in well-drained locations."

OAR 141-85-105, entitled "Jurisdiction," provides:

"(1)    Unless otherwise specifically permitted by statute or administrative rule, no person or governmental body shall remove more than 50 cubic yards of material from the beds or banks in any calendar year or place more than 50 cubic yards of fill in any waters of this state without a permit from the Director.

"(2)    ORS Chapter 541 pertains to the beds and banks of all waters of this state including lakes, streams, rivers, and the Pacific Ocean. The act shall apply to that portion of a natural water body lying below the level of bankful stage. Additionally, the act shall apply to all estuarine lands, including salt and tidal marshes, and other wetlands lying below the elevation at which significant woody vegetation (trees, etc.) ceases to grow because of frequent inundation.

■    Defendant contends that these administrative statements of the coverage of the Act are of no effect

because the legislature set the coverage of the Act by defining "waters of this state." An administrative agency can promulgate rules "on how it interprets a requirement, standard, or procedure already provided in the governing statute itself, and how it proposes to administer this statutory provision." *Morgan v. Stimson Lumber Company,* 288 Or 595, 603, 607 P2d 150 (1980). But the defendant contends the rules extend the coverage of the statute beyond the intent of the legislature. It bases its contention on the interpretation of "waters of this state" made by the Water Resources Board. The Water Resources Board administered the statute upon its enactment and fixed the limitation of its jurisdiction as the "mean higher high water mark"; that is, the average of the higher of the two daily high tides. We find nothing in the statute that gives this jurisdictional limit set by the Board any more credence than that later adopted by the Division of State Lands as set out in the above-quoted rules.

Defendant also relies upon a statement by a member of the House committee considering the legislation. Representative Magruder, a major supporter of the legislation, was asked:

"But Senator [sic] Magruder - I don't think your amendment limits it to the situation like developed in Astoria - It doesn't - this refers to any permit that would be issued; this piece of legislation just doesn't refer to estuaries."

He replied:

"It refers to fills in navigable waters - presumably below the line of mean high tide and the Astoria problem is although we are talking about Astoria it relates to any land in the State of Oregon below the high tide mark."

■ Statements of committee members as to the intention of legislation are credible legislative history; however, we do not find this particular statement persuasive. The question was not addressed to the issue of what is the upland end of the intended coverage of the proposed legislation. The defendant is relying upon the Representative's use of "mean high tide" and "high tide mark." These are technical terms. In the trial court, the defendant's counsel questioned in detail the expert called by the plaintiff as to his qualifications to define these terms. There is no showing the Representative knew of the fine distinctions

between the terms used to describe the various choices available to describe the exent of the Division's jurisdiction. He stated, "mean high tide" and "high tide mark." As the defendant admits, these terms literally refer to a different upper boundary than "mean higher high water" which defendant contends marks the upper boundary of an estuary.

The Division has defined the coverage as including "estuarine lands" "to the limit of tidal influence" and including marshes and lands "lying below the elevation at which significant woody vegetation [trees, etc.] ceases to grow. because of frequent inundation."

We conclude that the limits of the coverage of the Act as established by the agency rules are consistent with the intention of the legislature; that the legislature intended that the administering agency could establish the exact limits of the coverage of the Act consistent with the general limitation, "waters of this state."

The Court of Appeals found the fill was on "waters of this state" because the area was subject to "tidal influence." The defendant contends there was no evidence from which the Court of Appeals could make this finding. The record contains the following evidence to support the Court of Appeals' finding.

Mr. Harbert, an expert called by the plaintiff, testified that 30 per cent of the days of the year tidewaters would reach the area where the fill was made. Photographs taken in December 1977 when the tide was 7.0 feet were introduced. (The testimony was that mean higher high tide in this area was 7.2 feet or 7.3 feet.) They show a substantial area above or upland from the fill to be flooded. Defendant's expert was of the opinion that this was caused by a high river discharge in the Siuslaw River caused by normal winter rains. Plaintiff's expert saw no evidence of this. If there was a high discharge, the combination of high tide and high discharge brought in this water above the fill.

There were two culverts placed at either end of the fill. A tide gate was hung at the end of each culvert. Mr. Davidson, President of defendant, testified:

"A.   Well, a tide gate is hung on the end of a culvert where you have tidal influence to simply let the water out but you don't let the water in. It hinges and the water raises on the outside. The pressure of the tidal influence closes the gate and when it goes back down water on the inside, when the pressure gets greater on the inside the gate automatically opens.

"Q.   What was the purpose of the tide gates?

"A.   Well, two reasons perhaps of prime importance. One, again in the fall and winter we get what we call freshets or floods that it gets ten to fifteen foot equivalent tides, and these floods have a tremendous amount of silt and they would back — if we didn't have tide gates on, they would back in through the culvert and cover up our pasture land and cover it with silt and to some extent debris. And, I suppose the secondary reason, looking at it from an agricultural standpoint of what, thirty times a year — thirty percent of the time you had tidal influence which would probably improve the ability to manage the pasture land to dry it out."

The remaining question is what, if any, discretion does the trial court have in fashioning a remedy once it has been established that the defendant violated the statute by installing the fill without a permit?

In traditional equitable suits to secure a mandatory injunction against a private nuisance, the equity court balances the interests: weighing the hardship on the defendant if the injunction is issued against the hardship to the plaintiff if the injunction is not issued. *Frankland v. City of Lake Oswego,* 267 Or 452, 478-479, 517 P2d 1042 (1974). The trial court was of the opinion that the parties' interest should be balanced in this case. It held that if the fill was made contrary to statute, after weighing the equities, it would not order the fill removed but would order the tide gates removed and a three-foot culvert installed.

An additional element, however, is present in a case such as this. The legislature has provided that a fill must not be made on "waters of this state" unless a permit is obtained. We have decided that the defendant placed a fill on "waters of this state" and admittedly a permit was not obtained. Under such circumstances, can the courts hold that despite that the defendant has acted contrary to

the command of the legislature, the equities are such that the violation may continue if its ill effects are alleviated?

The decision most quoted on this issue is *Hecht v. Bowles,* 321 US 321, 64 S Ct 587, 88 L Ed 754 (1944). The defendant was found to have violated the Emergency Price Control Act in numerous instances by selling over the maximum prices. The statute provided: "* * * [U]pon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order or other order shall be granted without bond." The trial court found that the defendant acted in good faith and diligence and the issuance of an injunction would not insure better compliance in the future and would be unjust to defendant. The sole issue was whether the statute required that the court issue an injunction despite the language of the statute, an "injunction * * * shall be granted * * *." The Court, in an opinion by Mr. Justice Douglas, unanimously held that the trial court had the usual discretion of equity to grant or withhold the injunction; before legislation would be interpreted to the contrary, the intent of the legislature to change the traditional authority of the court of equity must be clear.

The facts are significantly different in this case from those in the *Hecht* case in that in the *Hecht* case the failure to grant an injunction did not result in a condition continuing to exist in violation of law.

The Oregon Court of Appeals, deciding the same issue under other statutes, has reached differing conclusions.

In *State ex rel Johnson v. Int. Harv.,* 25 Or App 9, 548 P2d 176 (1976), the state brought a suit under the Unlawful Trade Practices Act and the trial court found that the defendant misrepresented the capacity of a truck sold to a customer but the defendant had modified the truck to conform to its representation prior to trial. The trial court decreed that the defendant pay costs and attorney fees but refused to restrain defendant from generally misrepresenting goods. The Court of Appeals held that whether to issue the injunction was a matter of discretion.

It quoted with approval *Hecht Company v. Bowles, supra,* 321 US 321, that if the legislature had intended to require the courts to ignore the equity practice of balancing the equities in determining whether to issue an injunction "an unequivocal statement of its purpose would have been made." 321 US at 329. As in the *Hecht* case, however, the failure to grant an injunction did not result in the continuance of a condition violating the law.

In *State ex rel Lucas v. Goss,* 23 Or App 501, 543 P2d 9 (1976), the defendant was operating a mobile home park without a certificate of sanitation. He could not obtain a certificate because he was in violation of an Oregon Administrative Rule which requires the use of metal pipe for water lines in mobile home parks. The applicable statute provided the Health Division "may institute proceedings * * * to enforce obedience thereto by injunction * * * restraining such person * * * from further violation of such statute, rule * * * and enjoining upon them obedience thereto." The Health Division brought a suit for an injunction. The trial court ruled that if the defendant put up a bond (the condition of which was not stated), a certificate was to be issued. A majority of the Court of Appeals panel reversed and held:

"* * * It was bound to enforce the statute as written even if it considered enforcement of the statute inequitable under the circumstances of the particular case. * * *." 23 Or App at 505.

In *City of Portland v. Settergren,* 25 Or App 555, 549 P2d 1290 (1976), the defendant dumped landfill on a site without obtaining a permit as required by city ordinance. The city brought suit to require the defendant to remove the fill material. The trial court instead gave defendant the option of beautifying the site or removing the fill. The city appealed contending the court could not decide the case on equitable principles but was required to issue the injunction. The Court of Appeals held that violation of an ordinance does not of itself require the issuance of an injunction; the court can balance the equities. The terms of this ordinance were not set forth in the opinion. The court stated that its decision was consistent with *State ex rel Lucas v. Goss, supra,* 23 Or App 501, because in that case the appellate court had balanced the equities and

concluded that the trial court should have issued the injunction. The failure to grant the injunction did result in the continuance of a condition violating the ordinance.

The writers in the field also are divided on what is the state of the law. In Newsom, *State Court Injunctions and Their Enforcement in Environmental Litigation,* 9 St. Mary's L J, 821, 826 (1978), the author, a Texas Assistant Attorney General, Environmental Protection division, states:

> "While balancing the private/public equities is appropriate in traditional common law suits brought to enjoin private nuisances, evidence which balances the equities in a statutory cause of action for injunction is irrelevant. * * *."

He quotes a statement from *Texas Pet Foods, Inc. v. State,* 529 SW2d 820 (Tex Civ App Waco 1975), in support. On the other hand, in Winner, *The Chancellor's Foot and Environmental Law: A Call for Better Reasoned Decisions on Environmental Injunctions,* 9 Environmental Law 477, 506 (1979), the author, a member of the Regional Solicitor's Office of the Department of Interior, states:

> "* * * Most of the time, however, the legislation is silent as to injunctive remedy or merely says that an injunction 'may' issue. In this case, courts usually retain their full equitable discretion." p 506

The author observes:

> "* * * Some courts seem emboldened to give these legislatively declared values greater weight than those derived from social attitudes generally." p 507

In Johnson, *Enforcing the Federal Water Resource Servitude on Submerged and Riparian Lands,* Duke L J 347 (1977), the author, an Assistant United States Attorney, wrote about the use of the injunction to enforce the Federal Rivers and Harbors Appropriation Act of 1899 and the Federal Water Pollution Control Act. The 1899 Act is somewhat similar to the Oregon statute with which we are concerned in that it provides that no structure can be placed in any "water of the United States" without authorization from the Corps of Engineers. He wrote: "* * * It should be emphasized, however, that despite its unique appropriateness, the mandatory injunction is an equitable

remedy which is only available at the discretion of the court. * * *." p 377. He cites 5th and 9th Circuit cases which support his statement. p 385.

3 Davis, Administrative Law Treatise § 23.07, fn 7, 319 (1958), states:

"In a suit by an agency for a statutory injunction, a court of equity has discretion to grant or withhold relief on equitable grounds, even though the statute provides that upon a showing of violation the injunction 'shall' be granted. The Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944)."

■■ The determinative factor is legislative intent. We agree that "If, however, the legislation explicitly requires that 'an injunction must issue,' a court, barring constitutional problems, has no choice but to comply." Winner, *The Chancellor's Foot and Environmental Law: A Call for Better Reasoned Decisions on Environmental Injunctions,* 9 Environmental Law, *supra,* 506. The statute here under consideration, however, is not explicit in its directions and we must determine its intent from nonexplicit language.

The following provisions of the legislation are relevant to such determination. The director is to find certain general facts before he can issue a permit. ORS 541.625. An example of such facts is "that the proposed fill would not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation." Subsection (2). A hearing can be requested which shall be conducted as a contested case and an appeal can be taken to the courts as a contested case. ORS 541.625(5). The filling of any waters of the state without a permit is declared a public nuisance. ORS 541.645.

If the director determines that a fill is made on waters of the state without a permit, he can give notice of any order relating to a violation and the party aggrieved by the order can appeal to the circuit court. ORS 541.650(5). Filling without a permit "may be enjoined in civil abatement proceedings" and in such proceedings the director may seek damages "sufficient to compensate the public for any destruction or infringement of any public right of navigation, fishery or recreation resulting from such violation." ORS 541.650(6). "In lieu of penal enforcement

proceedings, proceedings to abate alleged public nuisances under ORS 541.645 may be instituted at law or in equity * * *." The director can also seek double damages for loss to the public from a negligent violation of the act or treble damages for an intentional violation. ORS 541.662.

The Court of Appeals in this case reasoned that the will of the legislature was that no fill can be erected in the waters of the state without a permit, that once it is proven that statute has been violated, the court must order it removed and that a court does not have the power to weigh the equities and decide the fill does not have to be removed if the violator does certain things. This was the argument of the state in the Court of Appeals.

In our opinion this reasoning does not necessarily lead to the conclusion reached by the Court of Appeals.

In the event of a violation of the statutes by the placement of a fill without a permit, ORS 541.645(6) provides that proceedings to abate the nuisance "may be instituted" by the Director. ORS 541.645(6) states that in the event of a fill being placed in violation of the statute the violation "may be enjoined." While the use of "may" as distinguished from "shall" does not always express an intent to make the doing of the act discretionary, there is nothing in the context to indicate that the intent was to change the usual meaning of "may" which means that the doing of the act is discretionary. *Cf. Dilger v. School District 24CJ*, 222 Or 108, 117, 352 P2d 564 (1960). Under such an interpretation the director has the discretion whether to seek an injunction and the court has the discretion whether to grant an injunction.

We assume that the legislature was aware that a court of equity, when asked to grant a mandatory injunction, traditionally balanced the equities and did not on all occasions order a mandatory injunction. Acting with such knowledge the legislature could have directed that the court "shall" or "must" grant the injunction. Or, the legislature could have bypassed the courts and commanded the director, in the event of violations, to remove every fill placed in violation of the statute. Administrative agencies, by appropriate delegation of power from the legislature, often are given their own means of enforcement.

■ We conclude that when the legislature provides that enforcement is to be by a court of equity and the duty of the court is phrased as "may" the intent of the legislature was that the usual rules of equity would apply and that the court had the power to balance the equities.

The legislature used the terms "abatement" and "injunction" and in the absence of any clear indication to the contrary, we assume that traditional rules of equity applicable to abatement and injunction were meant to apply.

As stated, the plaintiff has contended that the trial court did not have the authority to balance the equities and decide that the fill did not have to be completely removed. Plaintiff has not argued that if the trial court did have that power it incorrectly applied it.

■ There is evidence that the defendant inquired of the Division of State Lands about what permits were necessary to place the fill and was referred to the Corps of Engineers. There was evidence that the defendant was of the opinion that it was not necessary to obtain a permit from the Division of State Lands.

There was evidence that the removal of the tide gates and the addition of another culvert would prevent any injury to vegetation or fish life. The cost of doing what the trial court would have ordered was between $3,000 to $5,000 and with the tide gates removed the upland would be flooded occasionally. If the fill had to be completely removed, the $24,000 cost of erecting it would be lost. The cost of removal was estimated to be $30,000 to $40,000, and the defendant would incur significantly greater costs in transporting logs and agricultural products by a longer route.

Under these circumstances we conclude the trial court was justified in its alternative decree.

The decision of the Court of Appeals is reversed and the decree of the trial court is reinstated.